31 N.J. Super. 578 (1954)
107 A.2d 515
S. JOHN NITTA t/a AMERICAN CHICK SEXING ASSOCIATION, PLAINTIFF-APPELLANT,
v.
JOE MITSUO YAMAMOTO, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued August 9, 1954.
Decided August 18, 1954.
*579 Before Judges SCHETTINO, HETFIELD III and CAFIERO.
Mr. Daniel J. Dowling argued the cause for plaintiff-appellant (Messrs. Endicott, Dowling & Endicott, attorneys).
Mr. William Tomar argued the cause for defendant-respondent (Mr. Albert K. Plone, attorney for defendant-respondent; Mr. Charles A. Cohen on the brief).
The opinion of the court was delivered by SCHETTINO, J.S.C. (temporarily assigned).
Plaintiff appeals from a judgment of the Chancery Division based upon a determination that plaintiff had engaged in the business of an employment agency without license to do so and his failure to observe the statutory provisions for licensing makes a contract signed in violation thereof unenforceable. The statutory provisions in effect at the time of the making of the alleged contract were R.S. 34:8-1 et seq.; Employment Agencies Act.
Plaintiff's primary purpose was to enforce the covenant of an alleged agreement between the parties dated February 21, 1948 which generally bound defendant not to engage in the business of chick-sexing within the territories where he served under the agreement and not to perform any such services for customers of plaintiff whom defendant served under the agreement.
*580 The issues remaining after argument were: (1) was there a "contract"; (2) is the restrictive covenant contained therein enforceable; and (3) if there is a "contract," is it unenforceable because it is within the purview of R.S. 34:8-1 et seq. and plaintiff failed to comply with the statute? We feel that the last stated issue is dispositive of this appeal and shall therefore consider it first.
Plaintiff concedes that he had no license to carry on an employment agency; that if the alleged agreement is an employment agency one, the agreement would be unenforceable as held by the trial court and finally concedes that the restrictive covenant would also be unenforceable.
Plaintiff complains that the trial court did not consider the circumstances under which the agreement was written by plaintiff, the situation of the parties, the attendant circumstances and the objects plaintiff and defendant were striving to attain; and contends that consideration should be given to these subjects not for the purpose of changing the agreement but to secure light to measure its actual significance. "In short, we are to consider what was written in the light of the circumstances under which it was written, and give to the language a rational meaning consistent with the expressed general purpose." Casriel v. King, 2 N.J. 45, 51 (1949).
The record discloses that plaintiff used the trade name of American Chick Sexing Association and that he alone comprised the association. Plaintiff was once a check sexor. It is an art that only became generally known in recent years, and one that was a fairly closely held secret for a long while. Plaintiff built up a substantial business teaching and sending experts to hatcheries throughout the country to segregate chicks. At the time of trial there were approximately 16,000 hatcheries in the United States. Approximately 1,200 were customers of the plaintiff located in 41 states and three foreign countries. Plaintiff accumulated his customers by sending out circulars and advertising in national magazines and papers. For example, he exhibited at the New Jersey convention; called on hatcheries personally or by telephone or *581 wire, and sent representatives to interest them. If any hatcheries were interested, he would make the rounds of other hatcheries in the area to see if others might be interested; and tried to obtain work from sufficient hatcheries in any area to make it worthwhile both to himself and to the sexors. He bought hatchery customers from other chick-sexing service groups.
The development of the Vineland area, the locale involved in this action, began in Hammonton in 1940. Plaintiff entered into contracts with hatcheries in the Vineland area each year from 1943. Concededly plaintiff had a thriving business in the Vineland area during the years 1948, 1949 and 1950. In 1950 plaintiff had 30 hatcheries under written contract and served eight other hatcheries in the area without written contracts.
Defendant was born in the United States; went to Japan at the age of three; studied chick sexing at a school in Japan for three months and spent one month in practical training in that country; and returned to the United States in January, 1941, at the age of 17. In February, 1941 defendant went to see plaintiff to obtain a job. Plaintiff furnished him with employment, sending him to Butler, Pennsylvania with plaintiff's brother-in-law and sister to receive an apprenticeship. Thereafter, when the defendant was ready to go out on commercial work, plaintiff sent him to the Vineland area. Defendant worked with plaintiff from one month after his return to the United States until December 31, 1950, a period of approximately ten years.
The earliest written contract made between the plaintiff and defendant for work in the Vineland area was dated January 31, 1946 covering a period from January 31, 1946 to December 31, 1950. The restrictive covenant in this contract provided:
"I will not, during the term hereof and for three years after the expiration hereof, either directly or indirectly solicit the business of nor enter the employ of any hatchery or hatcheryman without your consent." *582 It is to be noted that there is no limitation as to space or area of restriction. Defendant served under this contract until the 1948 contract, dated February 21, 1948 was executed.
The 1948 agreement contained limitations of space and increased the restriction as to time from three to five years. It also contained instructions to defendant, giving names of the hatcheries to be served, telephone numbers, prices to be charged, the sexing days, when the sexors should be there, when the work was to be completed, conditions, accuracy and speed required and when the contract began and ended.
The method by which the hatcheries paid for having its chicks sexed was to give the sexor a check payable to plaintiff's American Chick Sexing Association. The checks and the sexor's weekly report were delivered to plaintiff who deposited the proceeds of the checks in a trust account, entered the amount in an account book. The proceeds, less the plaintiff's compensation as fixed in the sexor's contract, were paid to the sexor. Plaintiff deducted nothing for withholding taxes or social security taxes. If defendant did not maintain the degree of accuracy fixed in the contracts with the hatcheries, defendant was charged for such errors, and the amount of such charges was deducted from the amount paid by plaintiff to the sexor although plaintiff was, under the terms of his contract with the hatchery, liable to the hatchery for the loss suffered by the hatchery. There was a telephone listed under the name of American Chick Sexing Association in Vineland; the monthly cost of which was deducted from the earnings of all the sexors including defendant.
Plaintiff states in his brief: "We must admit that the 1948 contract, insofar as the intention of the parties is concerned, suffers from `a poverty of language' and `impropriety of terms.'" We agree with this mild indictment.
Plaintiff agreed with the hatcheries to furnish expert sexors; not that he would do the work. Plaintiff did not agree with the hatcheries to do the work of separating the chicks by sex. He did not agree to perform the business of *583 determining the sex of the chicks. He did agree for example to "furnish expert service of sexing seven hundred day-old baby chicks per hour with an accuracy of not less than ninety-five percent." Plaintiff bound himself to do nothing for defendant although he had the "sole listing for procuring employment" for defendant as a chick sexor.
Defendant sexor had to indemnify plaintiff and give a bond together with a deposit for $100 for the purpose of adjusting small claims resulting from his services. He had to pay his own expenses including maintenance and traveling and to carry automobile liability insurance in the amounts of at least $10,000 to $20,000. All accounts due for defendant's work had to be collected by him at his expense and thereafter defendant had to account to plaintiff. Defendant further agreed that "I will pay or direct my employer to pay you * * * [the plaintiff] * * * (b) Eighteen-percent of my earnings * * *" at plaintiff's election as to the form of compensation.
Plaintiff conceded at trial and at oral argument that no employer-employee relationship existed. On oral argument plaintiff stated that he and defendant were not in the positions of general contractor and sub-contractor but that defendant was plaintiff's "agent" of undefinable terms. The recited facts cannot assist plaintiff's contentions.
R.S. 34:8-1 in part states:
"`Employment agency' means and includes the business of procuring or offering to procure help or employment, or the giving of information as to where help or employment may be procured, whether the business is conducted in a building or on the street or elsewhere; or the business * * * for procuring work or employment for persons, where a fee or privilege is exacted, charged or received directly or indirectly for procuring or assisting or promising to procure employment, work, engagement or a situation of any kind, or for procuring or providing help or promising to provide help for any person, whether such fee is collected from the applicant for employment or the applicant for help.
"`Fee' * * * shall also mean and include the difference between the amount of money received by any person who furnishes employees * * * and the amount paid by him to the employees * * *."
*584 We hold that the alleged contract was one of similar transactions consummated in New Jersey by plaintiff, that of supplying workers for which plaintiff received a fee as comprehended by the statute. Plaintiff has been carrying on an employment agency.
We agree with the trial court that the statute is regulatory and penal requiring a license in order to pursue the employment agency business and that plaintiff, as an unlicensed agency, cannot maintain this action. Comparable holdings were made in Stack v. P.G. Garage, Inc., 7 N.J. 118, 121 (1951); and in Corson v. Keane, 4 N.J. 221, 226 (1950).
Affirmed.