**ROBERT T. WINZINGER, INC.**

v.

**MANAGEMENT RECRUITERS OF BUCKS COUNTY, INC. and Theodore M. Mashack, Appellants,**

State of New Jersey, Intervenor.

No. 87–5470.

United States Court of Appeals, Third Circuit.

Argued Jan. 7, 1988.

Decided Feb. 29, 1988.

Donald L. Goldman (argued), Cleveland, Ohio, for appellants.

Kathleen M. Calemmo (argued), Farr, Wolf & Lyons, P.C., Bellmawr, N.J. for appellee.

W. Cary Edwards, Atty. Gen. of N.J., Andrea M. Silkowitz, Asst. Atty. Gen., Margery F. Nathanson (argued), Deputy Atty. Gen., Newark, N.J. for intervenor.

Jerrold V. Moss, Robert P. Style, Catherine Panchou, Rubin, Quinn & Moss, Philadelphia, Pa., for amici curiae National Ass'n of Personnel Consultants, Indiana Ass'n of Personnel Consultants, Mid–Atlantic Ass'n of Personnel Consultants, New Jersey Ass'n of Personnel Consultants, Ohio Ass'n of Personnel Consultants, and Pennsylvania Ass'n of Personnel Consultants.

A. Bernard Frechtman, James E. O'Donnell, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for amicus curiae Association of Personnel Consultants of New York State, Inc.

Before SEITZ, HUTCHINSON, and GARTH, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

Defendants Management Recruiters of Bucks County, Inc. ("Management Recruiters") and Theodore M. Mashack appeal the order of the district court granting summary judgment in favor of plaintiff Robert T. Winzinger, Inc. ("Winzinger"). This court has jurisdiction under 28 U.S.C. § 1291 (1982).

I.

Winzinger is a New Jersey corporation engaged in the construction business, with its principal office in Hainesport, New Jersey. Management Recruiters, a Pennsylvania corporation, is a personnel placement service located in Newtown, Pennsylvania. Defendant Mashack is president of Management Recruiters.

The record contains the following undisputed facts. In early 1986, Management Recruiters learned that Winzinger was interested in hiring an estimator. An account executive from Management Recruiters telephoned Winzinger with information about a candidate for the position. Winzinger eventually filled the position with an individual who had been referred to the firm by Management Recruiters. In its dealings with Winzinger, Management Recruiters made approximately eight tele-

phone calls and several mailings from its Pennsylvania office, but no representative of Management Recruiters physically entered New Jersey in connection with the transaction.

After Winzinger filled the estimator position, Management Recruiters demanded payment from Winzinger of an $11,100 placement fee pursuant to an alleged fee agreement. In anticipation of efforts to collect this fee, Winzinger filed an action against Management Recruiters and Mashack in the Superior Court of New Jersey. Winzinger sought a declaratory judgment that any alleged fee agreement between itself and Management Recruiters was void and unenforceable because Management Recruiters had not complied with the requirements of the New Jersey Private Employment Agency Act ("the Act"), N.J.Stat. Ann. §§ 34:8–24 to –38 (West Supp.1987). Winzinger also sought to have Management Recruiters enjoined from attempting to enforce the alleged agreement.

The defendants removed the action to the district court on the basis of diversity of citizenship. In their answer to the complaint, they alleged, *inter alia*, that application of the Act to an employment agency located outside of New Jersey would be unconstitutional. They also filed a counterclaim seeking payment of the $11,100 placement fee.

Winzinger subsequently moved for summary judgment. During the pendency of that motion, the State of New Jersey, through the Attorney General, intervened to defend the applicability of the Act to the defendants and the constitutionality of this application.

The district court granted summary judgment in favor of Winzinger. The court held that the Act applied to out-of-state agencies doing business in New Jersey, that the Act as thus applied did not violate the commerce clause of the Constitution, and that Management Recruiters' failure to comply with the Act rendered the alleged fee agreement with Winzinger void and unenforceable. *See Robert T. Winzinger,*

*Inc. v. Management Recruiters of Bucks County, Inc.,* 668 F.Supp. 389 (D.N.J.1987). This appeal followed.

## II.

Our review of a district court's grant of summary judgment is plenary. In this case we must determine whether the Act applies to out-of-state employment agencies.[1] Neither the Supreme Court of New Jersey nor any other New Jersey court has had occasion to address this issue. As a federal court sitting in diversity, we must therefore predict how the Supreme Court of New Jersey would construe the Act.

The applicability of the Act to out-of-state agencies is, of course, entirely a matter of legislative intent. To ascertain this intent, we must examine the statutory language and policy; the recorded legislative history of the Act is silent on this question.

The Act was enacted in 1951 and amended in minor respects on three subsequent occasions. In general terms, it requires both owners and employees of employment agencies to obtain a license from the State and to conform their business practices to certain substantive standards. The basic purpose of the Act is to protect New Jersey employers and job seekers from unscrupulous or incompetent employment agencies. Administration and enforcement of the Act is committed to the Attorney General. N.J. Stat.Ann. § 34:8–36 (West Supp.1987).

Section 3 of the Act states that "[n]o person shall either directly or indirectly open, conduct or maintain an employment agency or perform any of the functions of an employment agency without first obtaining such license or licenses as is or are required by the provisions of this act." *Id.* § 34:8–26. Section 1 defines an employment agency as "the business of procuring or offering to procure help or employment, or the giving of information as to where help or employment may be procured." *Id.* § 34:8–24. Section 1 requires the owner of an employment agency to obtain an "em-

---

**1.** By an "out-of-state" employment agency we mean an agency that, like Management Recruit-

ers, does not have a place of business in New Jersey.

ployment agency owner's license." *Id.* This section also requires that an "employment agency operator's license" be obtained by every employee who manages or carries on the business of an employment agency. *Id.* Section 2 exempts several types of entities from the requirements of the Act. *Id.* § 34:8–25. None of these exemptions is relevant to the present case.

Applicants for either type of license must submit an application, *id.* § 34:8–27, and affidavits from other individuals attesting to the good moral character of the applicant, *id.* § 34:8–28.[2] An applicant for an operator's license must also demonstrate by means of a written examination his familiarity with the labor laws of New Jersey and the fields of employment in which he wishes to act as an employment agent. *Id.*

A license does not automatically issue to an applicant who complies with these requirements. Upon receiving an application for an owner's license, the Attorney General must provide notice and an opportunity to be heard to every holder of an owner's license in the county in which the proposed agency is to be located. *Id.* § 34:8–27. In the case of an application for an operator's license, similar notice and opportunity to be heard must be given to every holder of a owner's license in the county in which the applicant is to be employed. *Id.* The Attorney General may withhold any license if it appears that "the needs of employers and employees of any given municipality in which the employment agency is sought to be licensed are adequately served" by existing agencies and that "the granting of any additional license for an employment agency to be located in any given municipality is contrary to the best interest and welfare of the public." *Id.* § 34:8–34.

License holders must pay an annual fee. The amount of the fee for an owner's license is tied to the population of the municipality in which the agency is located. These fees range from $360 per year (for an agency in a municipality with a popula-

tion of 150,000 or more) to $90 per year (for one in a municipality with a population of less than 50,000). *Id.* § 34:8–31. All holders of an operator's license must pay an annual fee of $15. *Id.*

The Act prohibits employment agencies from engaging in a number of specific acts and practices. *Id.* § 34:8–33. It also imposes on agencies certain affirmative duties as to the conduct of their business. *Id.* § 34:8–32. Among these duties are the requirements that a licensed agency post on its business premises its fee schedule, *id.* § 34:8–32(2), and a copy of the owner's license, *id.* § 34:8–28; N.J.Admin.Code § 13:45B–2.1 (1987).

To date, two out-of-state employment agencies have been licensed under the Act.

## III.

The district court set forth three principal reasons in support of its holding that the Act applies to out-of-state employment agencies. Examining the wording of the statute, the court observed that both the definition of "employment agency" in section 1 and the prohibitory language of section 3 focus on the *function* of an employment agency without any reference to location. From this the court inferred that the Act should be read to reach any agency performing the specified functions in transactions with individuals or entities located in New Jersey, regardless of the location of the agency. The court also noted that the list of exempted entities in section 2 of the Act does not mention out-of-state employment agencies.

The court also asserted that application of the Act to out-of-state agencies is dictated by the legislative purpose of the statute: "Clearly, the statute is a consumer protection statute. It would be incongruous for the Legislature to have desired the statute to apply to New Jersey agencies, while allowing foreign agencies to avoid its requirements while providing the same ser-

---

**2.** Section 34:8–28 requires an applicant for an owner's license to submit affidavits from three citizens of New Jersey who have known the applicant for at least five years. An applicant for an operator's license must submit affidavits from two New Jersey citizens who have known the applicant for at least one year.

vices to New Jersey consumers." 668 F.Supp. at 391.

Finally, the court stated that "[t]he Attorney General, who is charged with enforcing the statute, has consistently interpreted it to have application to foreign agencies doing business in New Jersey." *Id.* The court maintained that this interpretation, although not conclusive, was entitled to great weight.

It is certainly true, as the district court noted, that the definitional and prohibitory provisions of the Act are broadly worded, and when taken in isolation these portions of the statute could be read to suggest a legislative intent to reach out-of-state agencies. It is also true that the statute does not explicitly exempt out-of-state agencies. These observations, however, do not end the analysis. In determining the legislative intent underlying a statute, a court must consider the statute as a whole. *Waterfront Comm'n v. Mercedes–Benz of N. Am., Inc.*, 99 N.J. 402, 414, 493 A.2d 504, 510–11 (1985). Looking beyond the aforementioned provisions to other parts of the Act, we conclude that the New Jersey legislature did not intend the Act to apply to out-of-state employment agencies.

A basic principle of statutory construction is that a court should avoid an interpretation of a statute that would lead to absurd or unreasonable results. *Davis v. Heil,* 132 N.J.Super. 283, 293, 333 A.2d 537, 542 (App.Div.), *aff'd,* 68 N.J. 423, 346 A.2d 405 (1975). Two provisions of the Act would produce plainly unreasonable results if applied to out-of-state agencies.

Section 8 of the Act relates the annual fee for an owner's license to the population of the municipality in which the agency is located. N.J.Stat.Ann. § 34:8–31 (West Supp.1987). The application of this provision to out-of-state agencies would be contrary to any reasonable understanding of the legislative intent. In establishing a graduated fee scale, the legislature cannot have contemplated that the crucial variable in the fee calculation would depend on how jurisdictions outside New Jersey have chosen to define their own boundaries.

Section 11 permits the Attorney General to deny a license to an otherwise qualified applicant if the needs of the municipality in which the applicant would be located are already adequately served by existing license holders. *Id.* § 34:8–34. Applying this provision to agencies located outside New Jersey would require the Attorney General to assess the extent to which the needs of municipalities *in other states* are adequately served by existing holders of New Jersey licenses there. Given that the purpose of the Act is to protect *New Jersey* employers and job seekers, it would be unreasonable to impute to the New Jersey legislature such solicitude for the needs of citizens in other states.

Sections 8 and 11 are the provisions that most strikingly demonstrate that the Act was not intended to apply to out-of-state agencies, but other provisions reinforce the point. Under the Act, agencies must display in their offices their schedule of fees, *id.* § 34:8–32, and a copy of their owner's license, *id.* § 34:8–28; N.J.Admin.Code § 13:45B–2.1 (1987). Although neither of these requirements would be flatly illogical if applied to out-of-state agencies, both provisions, with their emphasis on the physical place of business, suggest that the legislature directed the Act solely toward agencies that are physically located in New Jersey.

The Attorney General makes two principal arguments in favor of the extraterritorial application of the Act. First, he maintains that certain administrative interpretations have made it possible for the Act to be coherently applied to out-of-state agencies. He points to accommodations that the Private Employment Agency Section of the Department of Law and Public Safety has made as to the two out-of-state agencies currently licensed under the Act. These accommodations are represented to be as follows: (1) an out-of-state agency that wishes to do business in New Jersey may appoint a "registered agent" who is physically located within the state; (2) upon receiving an application for a license, the Attorney General gives notice and an opportunity to be heard to existing license holders in the county in which the registered agent is located; (3) in performing the "needs of the municipality" analysis

called for by section 11 of the Act, the Attorney General evaluates the needs of the municipality in which the registered agent is located; (4) not every employee of an out-of-state agency need obtain an operator's license; rather, such licenses must be obtained only by those employees who will be conducting business with New Jersey employers or job seekers; (5) the annual fee for the owner's license is based on the population of the municipality in which the registered agent is located.[3]

None of these interpretations has been promulgated according to the formal rule-making procedures prescribed by the Act. *See* N.J.Stat.Ann. § 34:8–36 (West Supp. 1987).[4] Management Recruiters maintains that this procedural deficiency requires us to ignore these interpretations. We need not address this argument because we find a more basic reason for rejecting the Attorney General's position.

If the purposes, policies, and language of a statute "point strongly to the imputation of a particular legislative intent, they may not be outweighed or overcome simply by a countervailing administrative practice." *Airwork Serv. Div. v. Director, Div. of Taxation,* 97 N.J. 290, 296, 478 A.2d 729, 732 (1984), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). More specifically, "[a]n administrative agency may not, under the guise of interpretation, extend a statute to include persons not intended." *In re Fisher,* 165 N.J.Super. 122, 128, 397 A.2d 738, 741 (Law Div.1978), *aff'd,* 171 N.J.Super, 588, 410 A.2d 282 (App.Div.1980). Here we have determined, for the reasons set forth above, that the legislature intended the Act to apply only to employment agencies physically located in New Jersey. The Attorney General's interpretations rest on a directly contrary premise. In the face of the legislative intent, the Attorney General's interpretations, however promulgated, can have no effect.[5] Indeed, the fact that the Attorney General has found it necessary to adopt so many special rules for out-of-state agencies amounts to an implicit concession that the Act as written cannot intelligibly be applied to such agencies.

The Attorney General's second argument is that limiting the application of the Act to in-state agencies conflicts with the Act's policy objective of protecting New Jersey employers and job seekers from unscrupu-

---

3. One other accommodation made by the Attorney General pertains to in-state agencies as well as out-of-state agencies. In 1975 the Attorney General issued an opinion letter voicing concerns about the constitutionality of the Act's requirement that an applicant supply affidavits from New Jersey citizens attesting to the character of the applicant. N.J.Stat.Ann. § 34:8–24 (West Supp.1987); *supra* note 2. The letter suggested that by, permitting character references only from New Jersey citizens, section 34:8–28 places an unconstitutional burden on potential applicants' right to interstate travel. Opinion letter from William F. Hyland, Attorney General, to Chester Hall, Supervisor of Private Employment Agency Licensing Section (Dec. 8, 1975). The Attorney General advised that applicants should be allowed to submit affidavits from citizens of any state who have known the applicant the requisite number of years. It appears that subsequent administration of the Act has accorded with the Attorney General's recommendation.

4. The Act authorizes the Attorney General to "make and promulgate such rules and regulations as may be required for the effectuation of the purposes and provisions of th[e] act." N.J. Stat.Ann. § 34:8–36 (West Supp.1987). Before issuing such regulations, the Attorney General must give written notice to each holder of an owner's or operator's license and hold a public hearing on the proposed regulations. *Id.*

5. The Attorney General asserts that the portions of the Act seemingly contravened by these interpretations are actually "directory" rather than "mandatory." He argues that he may "waive" or modify the requirements set forth in these provisions. We disagree. We find no indication in the Act that the legislature intended the Attorney General to administer these provisions in any manner other than that specified by the unambiguous language of the statute itself. Moreover, the Attorney General's argument necessarily implies that the legislature left the extension of the Act to out-of-state agencies entirely in his discretion—an untenable proposition.

We express no opinion as to the validity of the Attorney General's interpretation, set forth in his 1975 opinion letter, that section 34:8–28 of the Act permits an applicant to submit affidavits attesting to his character from citizens of states other than New Jersey. *See supra* note 3. Unlike the other interpretations offered by the Attorney General, the modification of the affidavit requirement applies to in-state agencies as well as out-of-state ones, and this case does not require us to decide the validity of this modification as to in-state agencies.

lous or incompetent employment agencies. He notes that modern communications technology enables an employment agency to do business throughout the country regardless of its physical location. As the facts of this case illustrate, an agency based outside of New Jersey can conduct business with New Jersey residents or firms entirely through the use of the interstate wires and mails. Such activity, the Attorney General contends, has the same impact on New Jersey employers and job seekers—and, if left unregulated, the same potential for injuring these parties—as does the activity of agencies physically situated within the state. Thus, citing the maxim that a statute should be construed so as to accomplish the legislative purpose, the Attorney General concludes that we should read the Act to reach *all* agencies that do business with individuals or firms in New Jersey.

This argument has considerable force, and the Attorney General's effort to extend the reach of the Act to out-of-state agencies is an admirable attempt to effectuate the perceived policy of the statute. We do not lightly disregard the Attorney General's understanding of the Act. Nevertheless, we must reject his position. We agree that a central purpose of the act is to protect New Jersey employers and job seekers who use the services of employment agencies. The language and structure of the statute, however, fairly indicate that the legislature did not intend to pursue this policy to the extent suggested by the Attorney General. Moreover, it is not unreasonable to impute to the legislature a desire to confine the reach of the statute to in-state agencies. In crafting the statute, the legislature presumably balanced the policy of protecting New Jersey citizens against competing considerations, such as the difficulty of enforcing the requirements of the Act against agencies located in other states. The legislature might quite plausibly have concluded that the costs of extraterritorial enforcement would exceed the associated benefits. It may well be true that changes in the employment agency industry have made application of the Act to out-of-state agencies more desirable now than it was when the statute was enacted

in 1951, but this court must interpret the Act as written. If changed circumstances call for expanding the reach of the statute, that action must come from the New Jersey legislature.

In sum, we find in the Act strong indications that the New Jersey legislature intended to limit application of the Act to in-state agencies. Accordingly, we believe that the Supreme Court of New Jersey, if confronted with the question in this case, would hold that Management Recruiters had no obligation to comply with the Act.

### IV.

In light of our construction of the Act, we need not consider whether application of the Act to out-of-state employment agencies violates the commerce clause of the Constitution. Likewise, we need not determine whether an agency's failure to comply with the Act prohibits the agency from enforcing an alleged fee agreement.

We will reverse the judgment of the district court granting summary judgment in favor of Winzinger. We will also order that the district court reinstate the defendants' counterclaim under the alleged fee agreement for further proceedings consistent with this opinion.