ACCOUNTEMPS DIVISION OF ROBERT HALF OF PHILADEL-PHIA, INC., PLAINTIFF-APPELLANT, v. BIRCH TREE GROUP, LTD., DEFENDANT-RESPONDENT.

Argued January 31, 1989—Decided July 13, 1989.

*James Curcio* argued the cause for appellant (*Pennington & Thompson,* attorneys).

*James P. Manahan* argued the cause for respondent (*Strauss & Hall,* attorneys; *Gordon C. Strauss,* of counsel).

*Andrea M. Silkowitz,* Assistant Attorney General, argued the cause for amicus curiae, Attorney General of New Jersey (*Donald R. Belsole,* Acting Attorney General, attorney; *Margery F. Nathanson,* Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

STEIN, Justice.

The critical issue in this case is whether the Private Employment Agency Act (the Act), *N.J.S.A.* 34:8-24 to -42, applies to out-of-state agencies that provide employment services to New Jersey employers. Plaintiff is an out-of-state employment agency that did not comply with the Act's licensing requirements before entering into a contract to provide services to a New Jersey employer. The employer refused to pay the agency its fee and this litigation ensued. The trial court granted the agency's motion for summary judgment. The Appellate Division reversed, holding that the Act applies to out-of-state employment agencies and that the agency's failure to comply with the Act's licensing requirements bars enforcement of the contract. *Accountemps v. Birch Tree Group,* 224 *N.J. Super.* 163 (1988). We now reverse and hold that the Act applies only prospectively to out-of-state agencies engaged in providing employment services to New Jersey employers.

I.

Accountemps is an employment agency organized as a division of Robert Half of Philadelphia, Inc. (Half), a private

employment agency operating in Pennsylvania. Accountemps has offices in Philadelphia and Bucks County and specializes in the temporary placement of accounting, financial, and data-processing personnel. Accountemps has operated an employment agency in Pennsylvania since 1964. During the course of this litigation it became licensed as an employment agency in New Jersey.

In February 1985, Birch Tree Group, Ltd. (Birch Tree), a music-publishing corporation located in Princeton, New Jersey, contacted Accountemps' Bucks County office seeking the services of an accountant for six to eight weeks. Accountemps agreed to provide Birch Tree with an accountant at an hourly rate of $15.30. The accountant began working at Birch Tree in March 1985.

Accountemps sent two letters to Birch Tree establishing the terms of the service agreement. The first letter confirmed the fee Birch Tree would be charged if it decided to hire the accountant on a permanent basis: "[T]he placement fee for an employee earning more than $29,001 is 30%." The second letter offered Birch Tree the opportunity to hire the accountant as a permanent employee.

Accountemps also provided Birch Tree with weekly time-recording forms, regularly signed and returned by Birch Tree, that certified the number of hours for which Birch Tree would be charged. The form bore the following legend:

In the event we [Birch Tree] employ this person in any capacity, and/or place him/her on our payroll during the temporary assignment or within one year of its severance, we agree to pay ROBERT HALF OF PHILA, INC., the regular placement fee. No part of the payments made by us on the temporary employment will be applied to the fee due for permanent placement. (A copy of the fee schedule is available on request.)

In May 1985, approximately two months after starting as a temporary employee, the accountant was hired by Birch Tree as the company's comptroller at a salary of $40,000 per year. Consequently, Half forwarded to Birch Tree an invoice for a permanent placement fee of $12,000 (30% of $40,000). Birch

Tree refused to pay the fee, alleging that Accountemps neither performed the services of an executive recruiting firm nor was engaged to do so.

In July 1985, Accountemps instituted this action for damages. Birch Tree moved for summary judgment, contending that Accountemps was barred from asserting its claim because it had failed to comply with the Act's licensing requirements. *N.J.S.A.* 34:8–26. The trial court granted summary judgment in favor of Accountemps. The court observed that the Act did not expressly prohibit the enforcement of contracts entered into by unlicensed agencies and that "[i]t would be sound policy in this case to not permit the statute of licensing to operate in what the court feels would be a disproportionate severity." The Appellate Division reversed and entered summary judgment in favor of Birch Tree. The Appellate Division reasoned that "[t]he permanent placement of employees in New Jersey by anyone not licensed by this State as an employment agency is contrary to public policy." 224 *N.J. Super.* at 166. We granted certification, 111 *N.J.* 651 (1988).

## II.

New Jersey's long-standing practice of employment-agency regulation dates back to 1893 when the Legislature passed an Act permitting municipalities to regulate employment agencies. *L.* 1893, *c.* 41. The Legislature sought to remedy the many "evils of private employment agencies:"

Some of the practices of private employment agencies are very inimical to the interests of the laboring people; they invariably receive applications for employment and advance fees far in excess of their ability to supply situations; the advance fee of a poor, needy applicant is received with as much pleasure when the chances of securing a position are a thousand to one against the applicant as under any other circumstances; they nearly always advertise for ten times as many laborers as needed. They advertise for laborers and mechanics to go to the State of Washington or some other remote part of the country, under the vague promise that steady employment and good wages will be secured. In addition to the usual registration fee, the applicants must buy railroad tickets, out of which the agencies receive additional commissions; it makes no difference whether there is any employment for them at the point of their destination

or not; the railroads get their pay, the agencies get their fees, and employers get a surplus of laborers, in consequence of which wages decline, many are unemployed, and thus trampism is superinduced through no fault of those honestly seeking employment. [*Report of the New Jersey Department of Labor* 73 (1893)]

Municipal regulation of employment agencies became mandatory in 1907. *L.* 1907, *c.* 230. This legislation required the licensing of all employment agencies and criminalized the furnishing of employment-agency services without a license, "whether such business is conducted in a building or on the street or elsewhere." *Ibid.* In 1914, the New Jersey Commission of Immigration released a report critical of the municipalities' enforcement of the private employment-agency regulations.[1] As a result, in 1918, legislation was enacted transferring to the State Department of Labor the authority to license and regulate all employment agencies. *L.* 1918, c. 227.

In 1951, the Legislature adopted the Private Employment Agency Act, which incorporated much of the prior legislation. *L.* 1951, *c.* 337 (codified at *N.J.S.A.* 34:8–24 to –42). The Act defines "employment agency" as "the business of procuring or offering to procure help or employment * * *" *N.J.S.A.* 34:8–24. The Act mandates licensing for all employment agencies "whether the business is conducted in a building or on the street or elsewhere." Further, "[n]o person shall either directly or indirectly, conduct or maintain an employment agency or perform any of the functions of an employment agency without first obtaining such license or licenses as is or are required by the provisions of this Act." *N.J.S.A.* 34:8–26. Failure to

---

[1] The report observed that the "larger part of [employment agency] business is done with alien women of all nationalities, for whom positions as domestics, waitresses for restaurants, and the like are secured." *Report of the New Jersey Commission of Immigration* 57 (1914). The report further noted that many agencies were conducted from saloons or living quarters and often "exploited immigrant girls" by encouraging prostitution or working as "servants in alleged disorderly houses and for immoral purposes." *Id.* at 62–63. The report concluded by recommending that the State take over regulation of employment agencies. *Id.* at 65–66.

comply with the licensing requirements subjects an unlicensed agency or owner to civil penalties ranging from fines of $300 to $1,500. *Ibid.*

Applications for licenses are to be made in writing to the Attorney General. *N.J.S.A.* 34:8–27. The Attorney General may request further information of the operator "to assist him in determining the applicant's responsibility and qualifications." *Ibid.* Before a license may be granted, notice of the application and an opportunity to be heard is to be afforded every employment-agency licensee in the county where the applicant agency is to be located. The Attorney General may withhold a license if it appears, after investigation or hearing, that the municipality in which the applicant seeks to locate is adequately served by public or private employment agencies. *N.J.S.A.* 34:8–34. The licenses are issued on an annual basis and the fee structure is based on the population of the municipality in which the license is sought. *N.J.S.A.* 34:8–31.

Every applicant for an operator's license shall submit to the Attorney General evidence of "good moral character," including affidavits of three New Jersey citizens who have known the applicant for a least five years. *N.J.S.A.* 34:8–28. An application for an owners' license requires proof of "good moral character" in the form of affidavits of two New Jersey citizens who have known the applicant for at least one year. *Ibid.*

The Attorney General has broad authority to administer the Act. *N.J.S.A.* 34:8–36. In exercising that authority, the Attorney General has interpreted the affidavit requirements, *N.J.S.A.* 34:8–28, as "incidental to the essential requirement that some evidence of good moral character must be submitted." Attorney General Opinion Letter to Division of Consumer Affairs (Dec. 8, 1975); *cf. Harvey v. Board of Chosen Freeholders of Essex County.*, 30 *N.J.* 381, 391–92 (1959) (waiver of statutory provision permitted when requirement is directory rather than mandatory). The Attorney General noted that the affidavit requirements of the statute "place a severe burden

upon those applicants who have recently moved to New Jersey or who reside in other States and who do not have sufficient contact with New Jersey citizens to obtain the requisite affidavits." Attorney General Opinion, *supra*, at 2. Accordingly, the Attorney General has directed that the affidavit requirements

allow[ ] those applicants who can satisfy all the other valid license requirements in *N.J.S.A.* 34:8–28, but cannot supply affidavits of good moral character from New Jersey citizens, to submit substitute evidence in the form of affidavits from citizens of any state who have known the applicant for the required amount of time. [Attorney General's Opinion, *supra*, at 3].

### III.

In *Winzinger Inc. v. Management Recruiters*, 841 *F.*2d 497 (1988), the Third Circuit Court of Appeals held that although the primary purpose of the Act is to protect New Jersey employees and employers, the language and structure of the Act indicates that the Legislature did not intend it to apply to out-of-state agencies conducting business in New Jersey. The Third Circuit acknowledged the question to be one of first impression and that its responsibility was to "predict how the Supreme Court of New Jersey would construe the Act." *Id.* at 498. The court found support for its decision by focusing on two provisions of the Act, *N.J.S.A.* 34:8–31 and –34. *Id.* at 500. *N.J.S.A.* 34:8–31 refers to the location of the agency as a means of establishing licensing fees. *N.J.S.A.* 34:8–34 authorizes the Attorney General to refuse to license an agency if the location in which the agency wishes to locate is adequately served by existing agencies. The court concluded that the local nature of these two provisions "most strikingly demonstrate[s] that the Act was not intended to apply to out-of-state agencies. * * * " *Ibid.* While the court's construction of the Act is plausible, our reading of the statutory scheme leads us to a different conclusion.[2]

---

[2]The Third Circuit opinion acknowledges that administrative interpretations of the Act have permitted the Act "to be coherently applied to out-of-state agencies." 841 *F.*2d at 500. Thus, out-of-state agencies may appoint registered

The language of the Employment Agency Act clearly reflects much of the regulatory scheme adopted in 1907. See *L.* 1907, *c.* 230. However, the conditions that characterized employment agencies at that time were significantly different from those that exist today. Electronic communication, increased mobility, and national advertising have transformed what was once a local industry into one that operates across state lines. Thus, it is not surprising that an Act passed in 1907 did not specifically address the question whether the licensing requirements apply to out-of-state employment agencies conducting business in New Jersey. In such circumstances, we must construe the statute " 'consonant with the probable intent of the draftsman' had he anticipated the situation at hand." *AMN, Inc. v. South Brunswick Township Leveling Bd.,* 93 *N.J.* 518, 525 (1983) (quoting *Jersey City Chapter of Property Owners Ass'n v. City Council,* 55 *N.J.* 86, 101 (1969)).

 Where a statute is silent or ambiguous, "it is our clear duty to choose that construction which will carry out the legislative intent of the statute as a whole * * *." *Horwitz v. Reichenstein,* 15 *N.J.* 6, 8 (1954); *accord In re Battle Petition,*

---

agents physically located within New Jersey. In performing the "needs of the municipality" analysis required by § 11 of the Act, *N.J.S.A.* 34:8–34, the Attorney General focuses on the needs of the municipality in which the registered agent is located. Moreover, the annual fee for the license is based on the population of the municipality in which the registered agent is located. *Id.* at 500–501; *see* Attorney General's Affidavit at 4–5, *Winzinger Inc. v. Management Recruiters,* 668 *F.Supp.* 389 (D.N.J.1987) (86–4170), rev'd, 841 *F.2d* 497 (3rd Cir.1988). At oral argument, the Attorney General observed that the municipal-based orientation of the licensing and fee provisions of the Act date back to the 1893 legislation, *L.* 1893, *c.* 41, pursuant to which the regulatory responsibility was imposed on municipalities rather than the State. Although we acknowledge the obvious inappropriateness of addressing so informally issues raised by the statute's application to out-of-state agencies, and encourage the Attorney General to proceed by formal rulemaking in order to implement these modifications, *see Woodland Private Study Group v. State,* 109 *N.J.* 62 (1987), we do not view these anachronistic statutory carry-overs from another day as conclusively establishing that the Legislature's intent was to limit its regulatory function to New Jersey employment agencies.

190 *N.J.Super.* 232, 236 (App.Div.1983); N. Singer, 2A *Suther-land Statutory Construction* §§ 45.02, 46.05 (Sands 4th ed. 1984). It becomes abundantly clear to one examining the entire statutory scheme, *see* 2A *Sutherland Statutory Construction, supra,* at § 46.05, that the Legislature's primary purpose in adopting the Private Employment Agency Act was to regulate the conduct of all employment agencies providing services to New Jersey employees and employers. It would frustrate that purpose to construe the Act to require agencies physically located in the state to be subject to comprehensive regulation, while allowing out-of-state agencies to carry on business in this State completely unregulated. *Cf. State v. Maguire,* 84 *N.J.* 508, 514 (1980) ("In resolving * * * questions of statutory construction, we are mindful that our task is to effectuate the legislative intent in light of the language used and the objects sought to be achieved."); K. Llewellyn, *The Common Law Tradition–Deciding Appeals* 374 (1960) (hereinafter *Llewellyn* ) ("If a statute is to make sense, it must be read in light of some assumed purpose").

The Act is a regulatory measure intended to alleviate abuses in the employment-agency industry. With this remedial purpose in mind, the Legislature required the licensing of *all* entities that "perform any of the functions of an employment agency." *N.J.S.A.* 34:8–26. Consistent with the broad scope of the licensing requirement, the Act's comprehensive regulations address all aspects of an employment agency's business. Although the Legislature may not have anticipated that out-of-state agencies would be providing services in New Jersey, it was foreseen that there would be a continuing need to regulate the activities of agencies in this State. "Broad purposes can indeed reach far beyond details known or knowable at the time of drafting * * *." *Llewellyn, supra,* at 374. Guided by these principles, we conclude that the scope of the Private Employment Agency Act includes those out-of-state agencies doing business in this State.

## IV.

■ We next consider Accountemp's contention that the Private Employment Agency Act, as applied to out-of-state agencies, imposes an unconstitutional burden on interstate commerce.

The analytical framework is set forth in *Pike v. Bruce Church* :

Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. [397 *U.S.* 137, 142, 90 *S.Ct.* 844, 847, 25 *L.Ed.*2d 174, 178 (1970).]

*See also* L. Tribe, *American Constitutional Law* § 6–5 (2nd ed. 1988) ("State regulation affecting interstate commerce will be upheld if (a) the regulation is rationally related to a legitimate state end, and (b) the regulatory burden imposed on interstate commerce, and any discrimination against it, are outweighed by the State interest in enforcing the regulation."). Although Congress has been given the exclusive authority to regulate interstate commerce, "there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it." *Kassel v. Consolidated Freightways Corp.*, 450 *U.S.* 662, 669, 101 *S.Ct.* 1309, 1316, 67 *L.Ed.*2d 580, 586 (1981). Each Commerce Clause inquiry "involves a sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce." *Raymond Motor Transp., Inc. v. Rice*, 434 *U.S.* 429, 441, 98 *S.Ct.* 787, 794, 54 *L.Ed.*2d 664, 675 (1978).

In *Coons v. American Honda Motor Co.*, 94 *N.J.* 307 (1983) (*Coons* I), we addressed the constitutional validity of *N.J.S.A.* 2A:14–22, a provision that tolled the statute of limitations in actions against foreign corporations that were not "represented" in this State. We held that the representation requirement was an unconstitutional forced licensure provision that unrea-

sonably affected the rights of foreign corporations engaged exclusively in interstate commerce. *Id.* at 318. We also addressed the subject of forced licensure statutes in *First Family Mortgage Corp. v. Durham,* 108 *N.J.* 277, 286 (1987):

It is true that the Supreme Court has held that forced licensure statutes violated the Commerce Clause. * * *

Nonetheless, a close analysis of those forced licensure cases discloses that in each of the cases the Court found that the qualification statute imposed *unreasonable* conditions on the foreign corporation's right to sue in a State court. [ (citations omitted).]

Unlike the statute in *Coons,* the Private Employment Agency Act does not provide unfair protections to in-state agencies. Rather, the Act requires all agencies, in-state and out-of-state, to comply with its provisions. The penalties for failure to comply with the Act apply equally to in-state and out-of-state agencies. The Act does not grant any exception or impose any restriction that favors in-state agencies over out-of-state agencies. In sum, the Act applies evenhandedly, and any burden on interstate commerce is incidental to the Act's regulatory purpose. Thus, the licensing requirement does not unfairly discriminate against competing foreign employment agencies.

Accountemps argues that the most severe burden on interstate commerce is found in the Act's requirement that affidavits be provided by New Jersey residents who have known the applicant for a determined number of years. *N.J.S.A.* 34:8–28. The Attorney General has recognized the problematic nature of the affidavit requirement when applied to out-of-state applicants. Attorney General's Opinion, *supra,* at 2. Accordingly, the Attorney General has interpreted the affidavit requirements to allow out-of-state agencies applying for a license in this State to submit affidavits of citizens from any state. *Id.* at 3.[3] We are satisfied that this interpretation of the statute

---

[3]The Attorney General's opinion was first called to the Court's attention during oral argument. In the interest of affording adequate notice to interested parties, the subject matter of the opinion might better be addressed by rulemaking. *See Woodland Private Study Group v. State,* 109 *N.J.* 62 (1987).

remedies any potential burden on interstate commerce that the affidavit requirement might otherwise have imposed. We conclude that the licensing requirement does not impose an unconstitutional burden on interstate commerce.

## V.

■ Our courts have consistently held that public policy precludes enforcement of a contract entered into in violation of licensing statute. *E.g., Stack v. P.G. Garage, Inc.,* 7 *N.J.* 118, 121–22 (1951) (unlicensed practice of law); *Gionti v. Crown Motor Freight Co.,* 128 *N.J.L.* 407, 411 (E. & A.1942) (unlicensed architect); *Design–4 v. Masen Mountainside Inn, Inc.,* 148 *N.J.Super.* 290, 293 (App.Div.1977) (unlicensed architect); *Tanenbaum v. Sylvan Builders, Inc.,* 50 *N.J. Super.* 342, 354 (App.Div.1958) (unlicensed real estate broker), aff'd, 29 *N.J.* 63 (1959); *Palkoski v. Garcia,* 32 *N.J. Super.* 343, 347 (App.Div. 1954) (unlicensed real estate broker); *Nitta v. Yamamoto,* 31 *N.J. Super.* 578, 584 (App.Div.1954) (unlicensed employment agency); *Solomon v. Goldberg,* 11 *N.J. Super.* 69, 75 (App.Div. 1950) (unlicensed real estate broker); *accord Restatement (Second) of Contracts* § 181 (1979); 6A A. Corbin, *Corbin on Contracts* § 1512 (1962) (hereinafter *Corbin* ). Thus, the Appellate Division was correct in its assumption that a failure to comply with the Act's licensing requirements would ordinarily serve as a bar to enforcing a contract. 224 *N.J. Super.* at 166; *see Nitta v. Yamamoto, supra,* 31 *N.J.Super.* at 584.

Professor Corbin explains that where a licensing statute is enacted to protect the public from fraud or incompetence, failure to comply with the licensing requirement generally renders the contract unenforceable. *Corbin, supra,* at § 1512. Nevertheless, this result is not always appropriate:

The statute may be clearly for protection against fraud and incompetence; but in very many cases the statute breaker is neither fraudulent nor incompetent. He may have rendered excellent service or delivered goods of the highest quality, his non-compliance with the statute seems nearly harmless, and the real defrauder seems to be the defendant who is enriching himself at the plaintiff's expense. Although many courts yearn for the mechanically applicable rule,

they have not made one in the present instance. Justice requires that the penalty should fit the crime; and justice and sound policy do not always require the enforcement of licensing statutes by large forfeitures going not to the state but to the repudiating defendant. [*Ibid.*]

Our conclusion that it would be inappropriate to require Accountemps to forfeit its fee because it was not licensed is based in part on our belief that the Private Employment Agency Act did not clearly indicate whether out-of-state agencies were subject to its provisions. The Third Circuit in *Winzinger, supra,* 841 *F.*2d at 500, firmly believed that "the Legislature directed the Act solely toward agencies that are physically located in New Jersey," relying on two of the Act's provisions, *N.J.S.A.* 34:8–31 and –34, which could be read as suggesting that the Act is to apply only to New Jersey agencies. *See supra* at 622–623.

Moreover, our courts have not previously had occasion to decide whether the Act applies to out-of-state agencies. While two early cases discuss the Act, neither is dispositive of the present issue. *Nitta v. Yamamoto, supra,* 31 *N.J.Super.* at 581–84 (contract entered into by unlicensed New Jersey agency rendered unenforceable); *Saks Theatrical Agency v. Mentime,* 24 *N.J. Misc.* 332, 334 (Camden Dist.Ct.1946) (court found out-of-state agency did not conduct an employment agency in this state).

■ Our ruling requiring out-of-state agencies that conduct business in this state to comply with the Act's licensing requirements will be applied prospectively. We acknowledge that retroactive application of judicial decisions is the general rule. *Rutherford Educ. Ass'n v. Rutherford Bd. of Educ.,* 99 *N.J.* 8, 21 (1985). However, we observed in *N.J. Election Law Enforcement Comm'n v. Citizens,* 107 *N.J.* 380, 389 (1987), that prospective application of a ruling may be appropriate after considering whether the decision constitutes a new principle of law; whether the purpose and effect of the ruling is furthered or retarded by retroactive application; and, whether retroactive application would produce substantial inequitable results. *Ac-*

*cord Rutherford, supra,* 99 *N.J.* at 23; *Coons v. American Honda Motor Co.,* 96 *N.J.* 419, 425, 440 (1984) (*Coons* II). The primary concern with retroactivity questions is with "considerations of fairness and justice, related to reasonable surprise and prejudice to those affected." *N.J. Election Law Enforcement Comm'n, supra,* 107 *N.J.* at 388.

Applying these principles, we conclude that our ruling decides an issue of first impression. We are satisfied that a prospective application, incorporating the Attorney General's opinion, will encourage compliance with the Act by out-of-state employment agencies and thus foster the legislative objective of comprehensive regulation. Moreover, in our view it would be unjust to require Accountemps to forfeit a substantial fee for the services it rendered to Birch Tree.

The judgment of the Appellate Division is reversed.

*For affirmance*—None.

*For reversal*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.