640 A.2d 817

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. CRAIG SZEMPLE, DEFENDANT-APPELLANT.

Argued October 12, 1993—Decided May 12, 1994.

*George T. Daggett,* argued the cause for appellant (*Daggett & Kraemer,* attorneys).

*Joseph Connor, Jr.,* Assistant Prosecutor, argued the cause for respondent (*W. Michael Murphy, Jr.,* Morris County Prosecutor, attorneys).

*J. Michael Blake,* Assistant Deputy Public Defender, argued the cause for *amicus curiae* Public Defender (*Zulima V. Farber,* Public Defender, attorney).

*Catherine A. Foddai,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Fred DeVesa,* Acting Attorney General, attorney).

*Ronald K. Chen* and *Sally Frank* submitted briefs on behalf of *amicus curiae* The American Civil Liberties Union of New Jersey.

*Alan L. Zegas* submitted a letter brief on behalf of *amicus curiae* Association of Criminal Defense Lawyers of New Jersey.

The opinion of the Court was delivered by

GARIBALDI, J.

This case involves the reach of two separate evidentiary privileges: the marital-communications privilege and the priest-penitent privilege. First, we address whether the marital-communica-

tions privilege, *Evidence Rule* 28,[1] *N.J.S.A.* 2A:84A–22, prevents the admission of an inculpatory letter that defendant sent to his wife and that the wife's father then took without permission. Second, we consider who holds the priest-penitent privilege, *Evidence Rule* 29, *N.J.S.A.* 2A:84A–23. If the clergyperson or the penitent, alone, holds the privilege, then that person can waive it unilaterally. If, however, both the clergyperson and the penitent hold the privilege, both must consent to its waiver.

I

Defendant, Craig Szemple, was charged in Morris County with first-degree murder, unlawful possession of a thirty-two caliber handgun, and murder while armed with that handgun. He was also indicted for murder in Warren and Hudson Counties. The Morris County indictment alleged that defendant shot a sixteen-year-old boy, Nicholas Miroff, to death in 1975. After the State had rested its case in the jury trial on that charge, it sought to reopen its case to present two admissions of guilt that defendant had allegedly made. The first admission was contained in a letter written to his wife that her father had discovered. The second admission was a confession defendant had made while in jail to a Minister of Visitation.

After an *Evidence Rule* 8 hearing, the trial court determined that neither the marital-communications privilege nor the priest-penitent privilege protected the admissions. The trial court granted the State's motion to reopen its case to present the two admissions. Rejecting defendant's argument that the new evi-

---

[1] The *N.J. Rules of Evidence* have been renumbered, with occasional deviations, to correspond with the *Federal Rules of Evidence*. This case began before the renumbering, and the parties and the Appellate Division use the old numbering. For the sake of continuity, we too will use the old numbering in this opinion.

For future reference, *Evidence Rule* 28 is now *Evidence Rule* 509 and *Evidence Rule* 29 is now *Evidence Rule* 511.

dence caused unfair surprise, the trial court denied defendant's motion for a mistrial.

On interlocutory appeal, the Appellate Division reversed the trial court's denial of defendant's motion for mistrial and granted leave to appeal to review the trial court's ruling that the evidentiary privileges did not apply. The Appellate Division, with one judge dissenting, upheld the trial court's evidentiary rulings. 263 *N.J.Super.* 98, 622 *A.*2d 248 (1993). We granted leave to appeal pursuant to *Rule* 2:2–1(a)(2) and now affirm.

## A

The facts related to defendant's claim of the marital-communication privilege are as follows. Early in 1991, after defendant was arrested, Theresa Boyle, defendant's wife, asked her father, Michael Boyle, to help her move. In the process of sorting through numerous boxes that Theresa had packed, Michael Boyle discovered some folded sheets of white paper that he identified as a letter from defendant to Theresa. He "said to [himself,] I don't know nothing about this guy and this looks like its going to be something for me to look at," so he kept the letter. At that time Mr. Boyle was worried about his daughter and did not know anything about defendant, other than that he was in jail on a murder charge. Mr. Boyle concealed the letter from his daughter by sticking it under his shirt. He carried it out to his pickup truck and placed it there in a plastic bag.

Mr. Boyle took the letter back with him to his home in North Carolina and "forgot about it." Several weeks later, he discovered the letter and finally read it. After deciphering defendant's handwriting, Mr. Boyle came to the conclusion that the letter was "dynamite," specifically page eight, which contained the following description of a murder that defendant had committed:

My first hit was an act of treachery, the ultimate deceit. 4 Bullets in the back 1 in the neck and a broken promise made at the parting of the oncoming river. I never did tell his mother what happened to him. The second I pulled that trigger, I became larger than death to all of my associates.

Mr. Boyle returned to New Jersey several months later, and gave a copy of the letter to his former wife, Theresa Boyle's mother. Mr. Boyle's ex-wife communicated with an attorney to inquire whether the letter would be helpful to the prosecutor, but was informed that the prosecutor did not need the letter because the State already had enough evidence against defendant. Based on that advice, neither Mr. Boyle nor his ex-wife disclosed the existence of the letter to the authorities.

Almost a year later, Mr. Boyle asked his daughter about the status of defendant's cases. When his daughter told him the charges were being dropped, Mr. Boyle drove to New Jersey from North Carolina and gave the letter to the Morris County prosecutor's office. Mr. Boyle had never told his daughter that he had the letter. When Theresa Boyle discovered he had the letter and had given it to the prosecutor, she became very angry. He testified that his "daughter won't have nothing to do with [Michael Boyle] now."

The prosecutor presented evidence that tied the statement in the letter to the murder. The trial court ruled that the letter was admissible. Although the letter would have been privileged under *Evidence Rule* 28 if Theresa had retained possession, the court held that the privilege no longer applied once Mr. Boyle, without Theresa's aid, consent, or connivance, obtained possession of the letter.

### B

The facts regarding the priest-penitent privilege are as follows. While in prison, defendant confessed his guilt to Paul Bischoff, a Minister of Visitation. Mr. Bischoff, a retired Newark firefighter, served with Trinity Baptist Church in Montville. He became a deacon in the church in 1974. According to Mr. Bischoff, the church elders, feeling that he had the gift to minister to those of God's people who are in need of the gospel, ordained him as a Minister of Visitation. The elders signed a "certificate of ordination" recognizing Mr. Bischoff's position. As a Minister of Visita-

tion, Mr. Bischoff visited members of the congregation and persons in hospitals, psychiatric wards, penitentiaries, and nursing homes, to comfort them and discuss their religious needs and concerns.

In his capacity as a visiting minister Bischoff met with defendant in jail about nineteen times between April 1991 and January 1992. In October 1991, defendant admitted to Bischoff that he had killed "not one but three." Bischoff, who had known defendant's family for at least twelve years, reported defendant's admission to defendant's sister and brother-in-law. One of defendant's family members related the admission to the prosecutor's office.

## II

We begin our analysis by reviewing well-established principles regarding evidentiary privileges. As a general proposition, privileges are to be narrowly construed. *United States v. Nixon*, 418 *U.S.* 683, 710, 94 *S.Ct.* 3090, 3108, 41 *L.Ed.*2d 1039, 1065 (1974); *State v. Schreiber*, 122 *N.J.* 579, 582–83, 585 *A.*2d 945, 946 (1991). That rule of construction stems from the fact that privileges "contravene the fundamental principle that ' "the public . . . has a right to every man's evidence." ' " *Trammel v. United States*, 445 *U.S.* 40, 50, 100 *S.Ct.* 906, 912, 63 *L.Ed.*2d 186, 195 (1980) (quoting *United States v. Bryan*, 339 *U.S.* 323, 331, 70 *S.Ct.* 724, 730, 94 *L.Ed.* 884, 891 (1950)). They "are obstacles in the path of the normal trial objective of a search for ultimate truth." *State v. Briley*, 53 *N.J.* 498, 506, 251 *A.*2d 442, 446 (1969); *see also State v. Dyal*, 97 *N.J.* 229, 237, 478 *A.*2d 390, 394 (1984) (holding that because testimonial privilege "precludes admission of relevant evidence, it is restrictively construed"); *State v. Bodtmann*, 248 *N.J.Super.* 100, 101, 590 *A.*2d 259, 260 (Law Div.1990) (noting that privilege that "obstructs the search for truth . . . must be construed restrictively").

Because privileges may often "undermine the search for truth in the administration of justice," *Dyal, supra*, 97 *N.J.* at 237, 478 *A.*2d at 394, they are accepted only to the extent that they

outweigh the public interest in the search for truth. *Trammel,*
*supra,* 445 *U.S.* at 50, 100 *S.Ct.* at 912, 63 *L.Ed.*2d at 195. "They
are accepted only because in the particular area concerned, they
are regarded as serving a more important public interest than the
need for full disclosure." *Briley, supra,* 53 *N.J.* at 506, 251 *A.*2d
at 446. Thus, privileges should always "be construed and applied
in sensible accommodation to the aim of a just result." *Ibid.*

### III

The marital-communications privilege, *Evidence Rule* 28,
*N.J.S.A.* 2A:84A–22, prevents disclosure by a spouse of confiden-
tial communications made during marriage except under specified
circumstances. At the time of defendant's trial, *Evidence Rule* 28
provided in pertinent part:

> No person shall disclose any communication made in confidence between such
> person and his or her spouse unless both shall consent to the disclosure.

The Legislature amended the marital-communications privilege by
Act of November 17, 1992, *L.*1992, *c.* 142. *Evid.R.* 28, *N.J.S.A.*
2A:84A–22. The amendment substantially relaxes the privilege to
permit disclosure of marital communication "in a criminal action or
proceeding *in which either spouse consents to the disclosure.*"
(emphasis added). The amendment applies "to all criminal actions
regardless of the date on which the offense was committed or the
action initiated." *Committee Statement to Senate* No. 1055,
*L.*1992, *c.* 142. Because defendant's wife did not consent to the
letter's disclosure, the recent amendment is not directly applica-
ble. Nonetheless that amendment clearly demonstrates the Leg-
islature's intent to limit significantly the preclusive effect of the
marital-communications privilege.

The marital-communications privilege has long been recognized
as a protector of marital confidences. It stems from the strong
public policy of encouraging free and uninhibited communication
between spouses, and, consequently, of protecting the sanctity and
tranquility of marriage. *See Wolfle v. United States,* 291 *U.S.* 7,
14, 54 *S.Ct.* 279, 280, 78 *L.Ed.* 617, 620 (1934); *Blau v. United*

*States,* 340 *U.S.* 332, 333, 71 *S.Ct.* 301, 302, 95 *L.Ed.* 306, 308 (1951); *Rozycki v. Peley,* 199 *N.J.Super.* 571, 579, 489 *A.*2d 1272, 1276 (Law Div.1984); 8 *Wigmore on Evidence* § 2332, at 642 (McNaughton rev. 1961); *cf. State v. Young,* 97 *N.J.L.* 501, 505, 117 *A.* 713, 715 (1922) (discussing requirement that communication loses privileged nature if overheard by third party).

■ Like other evidentiary privileges, however, "since the [marital communications] privilege has as its only effect the suppression of relevant evidence, its scope should be confined as narrowly as is consistent with the reasonable protection of marital communications." 1 *McCormick on Evidence* § 82, at 303 (J.S. Strong, 4th ed. 1992). As a result, the marital-communications privilege does not apply to a written communication between spouses that comes into the possession of a third party without the consent of the recipient spouse. *See Wigmore on Evidence, supra,* § 2339, at 668 (stating that general rule is that if written communications "were obtained surreptitiously or otherwise without the addressee's consent, the privilege should cease").

■ One well-known commentator on the law of evidence expresses the rule as follows:

> The weight of decision seems to support the view that the privilege does not protect against the testimony of third persons who have overheard (either accidentally or by eavesdropping) an oral communication between husband and wife, or who have secured possession or learned the contents of a letter from one spouse to another by interception, or through loss or misdelivery by the custodian. There is one important qualification which many if not most of the cases announce, namely that the privilege will not be lost if the eavesdropping, or the delivery or disclosure of the letter be due to the betrayal or connivance of the spouse to whom the message is directed.
>
> [1 *McCormick on Evidence, supra,* § 82, at 302–03 (footnotes omitted).]

*See also* 81 *Am.Jur.*2d *Witnesses* § 330 (1992) (stating that letters between husband and wife disclosing anything of confidential nature are privileged "at least as long as they remain in the hands of either party to the marriage"); 97 *C.J.S. Witnesses* § 270(b)(2) (1957) (stating that under most authorities, "confidential written communication between husband and wife * * * loses its privileged character on coming into the hands of third person"). The

privilege is personal to the spouses, and does not apply to third parties. *Young, supra,* 97 *N.J.L.* at 505, 117 *A.* at 715.

The majority of jurisdictions hold that the marital-communications privilege does not apply to a written communication obtained by a third person without the other spouse's aid and consent. This view comports with the goal of narrowly construing privileges that preclude relevant evidence and with New Jersey precedent.

No New Jersey court has held specifically that the marital-communications privilege is inapplicable to a written communication obtained by a third person. Nonetheless, New Jersey law has long held that the marital-communications privilege does not prohibit disclosure by third parties who overhear spousal conversations. In *State v. Laudisi,* 86 *N.J.L.* 230, 90 *A.* 1098 (1914), the Court of Errors and Appeals refused to apply the privilege to an accusation by one spouse against another in the presence of a neighbor. There, defendant objected to the admission of testimony by the neighbor concerning his wife's accusation and his reply on the grounds that it fell within the marital-communications privilege. The Court disagreed, holding that the presence of the third person vitiated the confidential nature of the communication. *Id.* at 231, 90 *A.* at 1098.

Similarly, in *Young, supra,* 97 *N.J.L.* 501, 117 *A.* 713, the Court of Errors and Appeals refused to apply the privilege to a communication that the defendant had transmitted to a third person with the instruction that it be communicated to the defendant's wife. The court reasoned that the communication to the third party destroyed the confidentiality of the communication:

> The privilege is personal to husband and wife. A third person who happened to overhear a personal conversation between husband and wife may be examined as to such conversation. *A letter, also written confidentially by a husband to a wife, is admissible against the husband when brought to court by a third party.*
>
> [*Id.* at 505, 117 *A.* at 715 (internal quotations and citations omitted) (emphasis added).]

In *State v. Brown,* 113 *N.J.Super.* 348, 273 *A.*2d 783 (1971), the Appellate Division refused to extend the privilege to cover a conversation between a father and his son which the mother

overheard. In addition to failing to qualify for the privilege because it was not an inter-spousal communication, the conversation was deemed to be not confidential due to the presence of the third party. *Id.* at 353, 273 *A.*2d at 786.

Finally, in *State v. Sidoti,* 134 *N.J.Super.* 426, 341 *A.*2d 670 (1975), the Appellate Division held the marital-communications privilege inapplicable to a communication between a husband and a wife because a third person had overheard it.

█ Those cases establish that the involvement of a third party vitiates the requirement of confidentiality. The privilege does not attach to the communication itself, but is personal to the spouses. *See Young, supra,* 97 *N.J.L.* at 505, 117 *A.* at 715. We see no important distinction in that regard between an oral and a written communication. The confidential nature of a letter is destroyed just as readily when a third party obtains it as when someone overhears an oral communication.

Cases from other jurisdictions support that position. In *Zimmerman v. State,* 750 *S.W.*2d 194 (Tex.Crim.App.1988), a capital-murder case, the defendant, while in custody, sent to his wife, Sherry Zimmerman, a letter that contained a confession to a murder. 750 *S.W.*2d at 195. Mrs. Zimmerman apparently kept that and other letters sent by the defendant in her dresser drawer. The defendant's mother-in-law, Viola Cobb, while admittedly without permission looking for evidence of defendant's guilt, took four letters out of her daughter's dresser drawer, read them, and then mailed them to her other daughter, Sandra Abner, who resided in Houston, Texas. *Id.* at 197. Ms. Cobb never discussed the contents of the purloined letters with Mrs. Zimmerman and fully intended that the letters would come into the possession of the proper authorities when she mailed them to Ms. Abner. *Ibid.*

In holding that the letter containing the confession was not a privileged marital communication, *Zimmerman* recognized the analogy between oral marital communications overheard by a third party and written communications obtained by third persons.

*Id.* at 199–200. The *Zimmerman* court adopted the rule that a Kansas Supreme Court opinion had annunciated that " 'where a written confidential communication between a husband and wife falls into the hands of a third party inadvertently and without the consent or connivance of the addressee-spouse, the third party should be permitted to testify as to the communication.' " *Id.* at 200 (quoting *State v. Myers,* 230 *Kan.* 697, 701, 640 *P.*2d 1245, 1248 (1982)). The court in *Myers* also observed that "[s]uch a rule, as applied to written communications, is entirely consistent with the rule, almost universally accepted, that oral statements of one spouse to another are admissible when overheard by a third person even without the knowledge or consent of the spouses." 640 *P.*2d at 1249.

The *Myers* Court held that confidential letters that the defendant had written to his wife, found under the mattress of a bed three months after the defendant's wife had vacated the premises, were not privileged under that rule. *Id.* at 1248. The court concluded that "the public interest would be best served by the requirement that all facts relevant to a litigated issue should be available to the court to the end that truth may be ascertained." *Ibid.; see also Commonwealth v. Skibicki,* 402 *Pa.Super.* 160, 166–68, 586 *A.*2d 446, 449–50 (holding that letter from defendant to wife found by used car salesman in glove compartment of car recently traded by defendant's mother-in-law was not privileged), *appeal denied,* 528 *Pa.* 637, 598 *A.*2d 993 (1991).

Defendant asserts that the privilege is lost only when the written communication was discovered "inadvertently" (meaning heedlessly or unintentionally). Judge Stein accepted that view in his dissent in the Appellate Division. In Judge Stein's opinion, the "inadvertency" requirement applies to the third-party discoverer of the confidential communication. See 263 *N.J.Super.* at 122, 622 *A.*2d at 261. Under his approach, the privilege would apply if the third party intended to discover the confidential communication, regardless of whether one of the spouses intended that it be discovered. For the privilege to be destroyed the third

party would have to discover the communication unwittingly or unintentionally.

That analysis applies the "inadvertency" requirement to the wrong person. "Inadvertent" refers to the spouse who receives the written communication, not to the third-party discoverer. The "inadvertency" requirement was meant to ensure that a *spouse* could not unilaterally defeat the privilege by intentionally or through some connivance or collusion with a third party allow a writing to fall into the hands of a third party. It does not apply to the conduct of the third-party discoverer.

We also note that the recent amendment to *Evidence Rule* 28, that permits a spouse unilaterally to defeat the privilege, diminishes the need for the "inadvertent discovery" rule. Now, a spouse who wants confidential marriage communications to be revealed need not orchestrate a situation in which those communications are revealed to a third party. The spouse can simply disclose the information directly to the court.

We agree with the lower courts that the confidential nature of defendant's letter was destroyed when the letter came into Mr. Boyle's possession. The record contains no evidence that even suggests that Mr. Boyle obtained the letter through any involvement of defendant's wife. To the contrary, defendant's wife did not discover that her father had the letter until more than a year after he had removed it from her house.

Both defendant and Theresa Boyle failed to take adequate precautions to prevent the letter from being found. Theresa Boyle inadvertently left the letter in a box that she asked her father to move. In the course of moving the boxes Mr. Boyle discovered the letter. No evidence exists that defendant ever asked his wife to destroy the letter or to keep it in a safe place. When defendant wrote the letter, he knew or should have known that a written communication may have a long life. Indeed, the danger of a written communication falling into the hands of a third party would appear to be more foreseeable than the danger of an

oral conversation being overheard. To obtain the benefit of the privilege, spouses must take the precautions necessary to ensure that inter-spousal communications be kept confidential. When they fail to do so, the privilege is lost.

Moreover, the theory of the dissent below rests on the unfounded assertion that Mr. Boyle "surreptitiously appropriated" the letter. 263 *N.J.Super.* at 122, 622 *A.*2d at 261 (Stein, J.A.D., dissenting). That finding is not supported by the evidence. Mr. Boyle discovered the letter in the course of assisting his daughter's move. He did not seek out the letter or intend to discover confidential communications. He happened on the letter. His discovery was unplanned. Although the act of concealing and removing the letter, once found, was clearly intentional, its discovery was not.

We hold, therefore, that under the circumstances in this case, the trial court properly concluded that the letter was not privileged and hence was properly admitted.

## IV

### A

Commonly referred to as the priest-penitent privilege, *Evidence Rule* 29, *N.J.S.A.* 2A:84A–23, provides:

> Subject to Rule 37, a clergyman, minister or other person or practitioner authorized to perform similar functions, of any religion shall not be allowed or compelled to disclose a confession or other confidential communication made to him in his professional character, or as a spiritual advisor in the course of the discipline or practice of the religious body to which he belongs or of the religion which he professes, nor shall he be compelled to disclose the confidential relations and communications between and among him and individuals, couples, families or groups with respect to the exercise of his professional counseling role.

*Evidence Rule* 37, now *Evidence Rule* 530, *N.J.S.A.* 2A:84A–29, permits the holder of an evidentiary privilege to waive that privilege by disclosing the confidential communication or consenting to its disclosure. There is no doubt that Mr. Bischoff consent-

ed to the disclosure of the defendant's confession.[2] The critical issue is whether the clergyperson alone may waive the privilege pursuant to *Evidence Rule* 37, or whether both the clergyperson and the penitent must waive the privilege before the clergyperson may testify regarding the confidential communication. In other words, we must determine who holds the privilege for the purpose of waiving the privilege.

■ Construction of any statute necessarily begins with a consideration of its plain language. *Town of Morristown v. Woman's Club*, 124 *N.J.* 605, 610, 592 *A.*2d 216, 219 (1991); *Kimmelman v. Henkels & McCoy, Inc.*, 108 *N.J.* 123, 128, 527 *A.*2d 1368, 1370–71 (1987). *Evidence Rule* 29 does not specify whether the clergyperson, the penitent, or both hold the privilege. The priest-penitent privilege, however, is directed toward the clergyperson who shall not be *allowed* or *compelled* to disclose a confidential communication made to him or her in his or her professional character. Defendant argues that the inclusion of the phrase "shall not be allowed ... to disclose" indicates that the penitent, as well as the clergyperson, must consent to the disclosure to have a valid waiver of the privilege. According to defendant's argument, the phrase refers to the penitent "allowing" the clergyperson to reveal the confidential communication.

The Appellate Division determined that the word "allow" may instead "refer to the court and/or State 'allowing' a clergyperson to breach his or her vow of confidentiality by considering such a

---

[2] The trial court initially found that Mr. Bischoff did not qualify for the privilege because he was not an ordained clergyperson. It nonetheless concluded, assuming that the privilege applied, that Bischoff properly had waived it without defendant's consent. The State does not contend that Bischoff was not a clergyman within the contemplation of the privilege. Noting that neither the trial court nor the parties raised that issue, the Appellate Division did not address it, but assumed without deciding that Bischoff was within the catalogue of clergypersons covered by the rule. 263 *N.J.Super.* at 116 n. 10, 622 *A.*2d at 257. Likewise, we do not reach the issue of whether Bischoff qualifies as a clergyman, minister, or other person or practitioner for the purposes of *Evidence Rule* 29, but assume that he does.

person a competent witness to disclose a confidential communication." 263 *N.J.Super.* at 107, 622 *A.*2d 248. Those differing interpretations demonstrate that the phrase's meaning is not obvious or self-evident on its face.

When a statute is ambiguous, the Court must construe the statute in a way that will best effectuate the Legislature's intent. *Cedar Cove, Inc. v. Stanzione,* 122 *N.J.* 202, 213, 584 *A.*2d 784, 789 (1991); *Accountemps Div. v. Birch Tree Group,* 115 *N.J.* 614, 622, 560 *A.*2d 663, 667 (1989). Although we are mindful that a construction that renders any part of a statute superfluous or meaningless is to be avoided, *State v. Reynolds,* 124 *N.J.* 559, 564, 592 *A.*2d 194, 196 (1991); *Medical Soc'y v. Department of Law & Public Safety,* 120 *N.J.* 18, 26–27, 575 *A.*2d 1348, 1352–53 (1990), we are equally mindful that the general intention of the statute controls interpretation of its parts. *Waterfront Comm'n v. Mercedes-Benz of N. Am., Inc.,* 99 *N.J.* 402, 414, 493 *A.*2d 504, 510–11 (1985).

Where an ambiguity exists in the language of the statute, a court may rely upon extrinsic aids to resolve the ambiguity. *State v. Sutton,* 132 *N.J.* 471, 479, 625 *A.*2d 1132, 1136 (1993); *see also New Jersey Civil Serv. Ass'n v. State,* 88 *N.J.* 605, 615, 443 *A.*2d 1070, 1075 (1982) (stating that such materials may serve as aids but may not be used to give a meaning not fairly within a statute). "Courts may ... freely refer to legislative history and contemporaneous construction for whatever aid they may furnish in ascertaining the true intent of the legislation." *New Jersey Pharmaceutical Ass'n v. Furman,* 33 *N.J.* 121, 130, 162 *A.*2d 839, 844 (1960). In addition, "the reports of special committees or commissions appointed to study and suggest legislation are considered valuable aids" in seeking the intent of the Legislature. *Shapiro v. Essex County Bd. of Freeholders,* 177 *N.J.Super.* 87, 93, 424 *A.*2d 1203, 1206–07 (Law Div.1980), *aff'd,* 91 *N.J.* 430, 453 *A.*2d 158 (1982); *see* 2A Sutherland, *Statutory Construction,* § 48.11.

### B

Based on our review of the origin of the priest-penitent privilege and the history of the privilege in New Jersey, we

conclude that *Evidence Rule* 29 confers a testimonial privilege only on clergypersons. They alone may elect to waive that privilege in their sole discretion and within the dictates of their religious beliefs. The penitent need not consent to the disclosure of a confession, confidential communication, or confidential relation in order for the clergyperson to waive the privilege. Such a conclusion best effectuates the goals of the Legislature.

The priest-penitent privilege originated with the seal of confession. Under the Code of Canon Law of the Roman Catholic Church for a "confessor in any way to betray a penitent * * *" was a crime. Raymond C. O'Brien and Michael T. Flannery, *The Pending Gauntlet to Free Exercise: Mandating That Clergy Report Child Abuse*, 25 *Loy. L.A.L.Rev.* 1, 31 (1991) (hereinafter O'Brien and Flannery). A confessor who directly violates the seal of confession incurs an automatic excommunication reserved to the Apostolic See. *Id.* at 31. Traditionally, breaking the seal of confession "has been one of the most severely penalized offenses within the Code." *Ibid.* The sanctity of the confession was recognized in English law from the Norman Conquest in 1066 until the English Reformation in the Sixteenth Century. After the Reformation, hostility towards the Catholic Church in England resulted in a refusal to recognize the privilege. *See* O'Brien and Flannery, *supra*, 25 *Loy.L.A.L.Rev.* at 31–32; William A. Cole, *Religious Confidentiality and the Reporting of Child Abuse: A Statutory and Constitutional Analysis*, 21 *Colum. J.L. & Soc. Probs.* 1, 19–20 (1987) (hereinafter Cole); Mary Harter Mitchell, *Must Clergy Tell? Child Abuse Reporting Requirements Versus Clergy Privilege and Free Exercise of Religion*, 71 *Minn.L.Rev.* 723, 736 (1987) (hereinafter Mitchell); Jacob M. Yellin, *The History and Current Status of the Clergy–Penitent Privilege*, 23 *Santa Clara L.Rev.* 95, 95–108 (1983) (hereinafter Yellin); *see also In re Grand Jury Investigation*, 918 *F.*2d 374, 381 n. 10 (3rd Cir.1990) (sketching origins of privilege).

When this country was founded, therefore, the privilege did not exist at common law. Accordingly, American courts required that

the privilege be conferred by statute. Where no privilege existed, clergypersons were often compelled to testify despite personal, moral, and religious objections. Yellin, *supra*, 23 *Santa Clara L.Rev.* at 107. Although the Roman Catholic Church has the longest tradition of the sanctity of the confessional, for many other Christian denominations their "sincere dedication to secrecy is equally apparent." Cole, *supra*, 21 *Colum. J.L. & Soc. Probs.* at 17. In the Episcopal Church, for example, the new Book of Common Prayer's rite, "The Reconciliation of a Penitent," warns that the secrecy of a confession is morally absolute for the confessor, and must under no circumstances be broken. Violators are subject to church discipline. *Ibid.* The governing body of the American Lutheran Church also has adopted a resolution that the pastor hold inviolate and disclose to no one the confessions and communications made to him as a pastor without the specific consent of the person making the communication. Similarly, the Presbyterian Church in the U.S., the United Presbyterian Church, and the American Baptist Convention have adopted policy statements strongly affirming the inviolability of religious confidentiality. *Id.* at 17–18.

The prospect of clergy going to jail to comply with their religious beliefs rather than disclosing a penitent's confession resulted in various religious groups bringing pressure on state legislatures to enact a clergyperson privilege. Thus, the origin of the priest-penitent privilege as well as the moving force behind the enactment of the statutory privilege was to protect the clergyperson from being forced *against his or her will* to reveal confidences. Yellin, *supra*, 23 *Santa Clara L.Rev.* at 107. Now almost all states have clergyperson-penitent privileges. *Id.* at 107–10.

New Jersey did not recognize the privilege until it was created by statute in 1947. *See State v. Morehous*, 97 *N.J.L.* 285, 295, 117 *A.* 296, 300 (E. & A. 1922). By Act of June 20, 1947, *L.* 1947, *c.* 324, the Legislature enacted *N.J.S.A.* 2A:81–9, which provided:

A clergyman, or other minister of any religion, shall not be allowed or compelled to disclose in any court, or to any public officer, a confession made to him in his professional character, or as a spiritual advisor, or as a spiritual advisor in the

course of discipline enjoined by the rules or practice of the religious body to which he belongs or of the religion which he professes.

Like its present-day equivalent, that precursor to *Evidence Rule* 29 did not identify the holder of the privilege. The Legislature enacted it under a subsection dealing with the competency of witnesses, and the subsection did not contain a provision subjecting it to waiver. On its face that original version of the priest-penitent privilege arguably could be no privilege at all, but rather a rule of competency. The plain meaning of the statute seems to suggest that a clergyperson is not competent to disclose in any court or to any public official confessions made to him or her. It reads as an absolute ban on disclosure. *See* Richard J. Biunno, *Rules of Evidence,* comment 1 and 2 on *Evid.R.* 29 (1993) (hereinafter Biunno) ("the thrust of the rule and the original statute [was] that under no circumstances should a religious figure be considered as a source of evidence of this type"); Biunno, *supra,* comment 1 on *Evid.R.* 511 (stating same).

The recommendations of the two committees commissioned to study *Evidence Rule* 29, however, demonstrate that from its 1947 enactment, the statute was intended as a privilege and not merely as a rule of competency. In the early 1950s, this Court commissioned a committee to study the law of evidence and to make recommendations. That committee, the Committee on the Revision of the Law of Evidence (hereinafter the Jacobs Committee), issued its report in 1955. The report took the form of a comparison between the then-existing New Jersey Evidentiary statutes and the Uniform Rules of Evidence that had been developed by the National Conference of Commissioners on Uniform State Laws. Because the Uniform Rules met with wide acceptance, the Jacobs Committee determined to use them as a base for its study. *Report of the Committee on the Revision of the Law of Evidence to the New Jersey Supreme Court* viii–ix (1955) (hereinafter the "*Jacobs Committee Report* ").

The Uniform Rule with respect to who has the power to waive the priest-penitent privilege, reads as follows:

Rule 29. Priest–Penitent Privilege; Definition; Penitential Communications.

(2) A person, whether or not a party, has a privilege to refuse to disclose, and to prevent a witness from disclosing a communication if he claims the privilege and the judge finds that (a) the communication was a penitential communication and (b) the witness is the penitent or the priest, and (c) the claimant is the penitent, or the priest making the claim on behalf of an absent penitent.

The Drafters' comment to the rule stated that the "rule permits either priest, broadly defined, or penitent to claim the privilege." *Jacobs Committee Report, supra,* at 76.

The Jacobs Committee advised against the adoption of the Uniform Rule, recommending that *N.J.S.A.* 2A:81–9 be adopted verbatim as the rule. *Ibid.* In its annotation the Committee made the following pertinent comments:

4. *Comparison between the New Jersey Statute and Uniform Rule.*

Under the rule the privilege belongs to the penitent, and he can waive it by partial disclosure to any one, or waive it in other ways, thereby compelling the priest to testify. The statute seems preferable.

5. Under the rule the penitent has a privilege to refuse to disclose his confession whereas under the statute he has no privilege at all. Although the rule is better here, such disclosures almost always would be hearsay and therefore the matter is not important.

[*Id.* at 76–77.]

Those comments depict the Jacobs Committee's fear that under the rule the clergyperson could be compelled to testify and to divulge confidences. As the Appellate Division majority below noted, that concern may have stemmed from the desire to protect the clergyperson's free exercise of religion or from the desire to curb the potential manipulations of a penitent who, through waiver, could compel a clergyperson to reveal communications that were given purposely to mislead. 263 *N.J.Super.* at 110–11 n. 5, 622 *A.*2d at 254.

Although the Jacobs Committee indicated that the Uniform Rule was preferable to the extent it permitted the penitent to refuse to disclose a confession, it rejected that rule in favor of the then-existing statute, which did not confer any privilege on the penitent. *Jacobs Committee Report, supra,* at 77. Instead it preferred the statutory language under which the penitent had

"no privilege at all" and under which the clergyperson could not be "allowed or compelled" to disclose. *Ibid.*

The language chosen by the Jacobs Committee indicates on its face that the penitent does not hold the privilege. Because the Jacobs Committee was concerned about the clergyperson being compelled to testify, its preference for the statute indicates that it viewed the statute as granting an evidentiary privilege to the clergyperson alone. Indeed, reading the statute to make the clergyperson the sole holder of the privilege seems the best way to ensure that the fears of the Jacobs Committee will not be realized; because the penitent does not hold the privilege, he or she cannot effectively waive it through disclosure or otherwise and therefore cannot compel disclosure by the clergyperson. That is the view that the majority in the Appellate Division adopted and that the State urges on this Court.

Based on the *Jacobs Committee Report,* the Legislature retained *N.J.S.A.* 2A:81–9. Following the issuance of the *Jacobs Committee Report,* the Legislature appointed the Commission to Study the Improvement of the Law of Evidence (hereafter the Bigelow Commission). J.Res. 15., 179th Leg., 1955 *N.J.Laws* 1026. The Bigelow Commission issued its report in November of 1956. See *Report of the Commission to Study the Improvement of the Law of Evidence* (1956) (hereinafter the *"Bigelow Commission Report "*). With regard to the priest-penitent privilege, the Bigelow Commission essentially recommended that the Legislature adopt the Jacobs Committee recommendation. *Bigelow Commission Report, supra,* at 38.

The Bigelow Commission suggested two substantive changes to *N.J.S.A.* 2A:81–9, the then-existing statute that the Jacobs Committee had endorsed. First, it expanded the scope of the non-disclosure rule to include "other confidential communications" in addition to confessions. Second, it made the non-disclosure rule subject to waiver. Regarding the former, the Bigelow Commission explained: "This Commission had added confidential communications[ ] [that] might not qualify as confessions but which

should be privileged." *Ibid.* It made no reference in its comment to the inclusion of the phrase making the non-disclosure rule subject to waiver.

That the Bigelow Commission believed that *N.J.S.A.* 2A:81-9 was or should be a waivable privilege and not a rule of competency is evidenced by both the inclusion of the waiver provision and the comment that confidential communications should be privileged. If the non-disclosure rule could be waived, it certainly could not be an absolute ban on disclosure by the clergyperson. It could not be a rule of competency.

The Commentator to the New Jersey Rules of Evidence claims that "[t]he inclusion of [the waiver] provision by the Bigelow Commission was probably in error because it contradicts the thrust of the rule and the original statute, namely that under no circumstances should a religious figure be considered as a source of evidence of this type." Biunno, *supra,* comment 1 on *Evid.R.* 511. Although the Bigelow Commission's inclusion of the waiver provision may have been based on a misunderstanding of the original nature of the non-disclosure rule, this Court cannot ignore its subsequent adoption by the Legislature by Act of July 1, 1960, *L.*1960, *c.* 52. We simply cannot ignore the express reference to the *Evidence Rule* 37 waiver.

The inclusion of the waiver provision by the Bigelow Commission and its subsequent adoption by the Legislature does not, however, answer the question of who can waive the privilege. That the language is directed toward the clergyperson and does not expressly repose the privilege in the penitent we find telling, particularly in light of the fact that the Legislature clearly identified the holder of other evidentiary privileges. *See e.g., Evid.R.* 26 (stating that attorney-client privilege belongs to client); *N.J.S.A.* 45:14B-28 (stating that psychologist's privilege belongs to client); *N.J.S.A.* 2A:84A-22.1 to -22.9 (stating that patient-physician privilege belongs to patient); *Evid.R.* 32 (stating that trade-secret privilege belongs to owner of secret, which may be claimed by agent or employee); *Evid.R.* 23(2) (stating that spouse of accused

can testify without consent of defendant spouse); *Evid.R.* 28 (providing that spouse of accused can reveal marriage communications without consent of defendant spouse).

Moreover, valid reasons exist why the confider in the attorney-client privilege and the physician-patient privilege holds the privilege, but the penitent in the clergyperson-penitent privilege does not.

> [M]any ministers believe it to be a religious obligation to maintain the secrecy of penitential communications despite the willingness of the penitent to allow disclosure. In addition, it has been suggested that allowing a clergyman to testify when a privilege is waived may lead to a penitent abusing the privilege.
>
> [Yellin, *supra*, 23 *Santa Clara L.Rev.* at 137.]

Abuse of the privilege could occur, for example, if a scheming penitent were to confess to several different versions and then waive privilege for the one best suited for his or her purpose. *Ibid.* The Jacobs Committee voiced major concerns over the potential for a penitent to manipulate the privilege.

We find the plain waiver language of the statute, the interpretation of the statute by the Jacobs and Bigelow Committees, and the origin of the privilege to be persuasive evidence that the clergyperson is the only person who can waive the privilege. *Evidence Rule* 29 was written in reference to the clergyperson. It was the clergyperson with whom the Jacobs Committee was concerned when it recommended that the then-existing statute be retained. Neither the original priest-penitent privilege nor the statute as originally drafted was overly concerned with the penitent. *See Jacobs Committee Report, supra,* at 77.

The only New Jersey case before this one involving the priest-penitent privilege also supports this view. *In re Murtha,* 115 *N.J.Super.* 380, 279 *A.*2d 889 (App.Div.1971), involved the question of whether a Roman Catholic nun could assert the priest-penitent privilege in response to questions regarding her conversations with one of her former pupils. After holding that a nun did not qualify as "a clergyman, minister or other person or practitioner authorized to perform similar functions," *id.* at 386–87, 279 *A.*2d at 892–93, the Appellate Division suggested that even if the privilege

applied generally to nuns, it did not apply in that case because the nun had waived the privilege when she signed a sworn statement regarding her conversations with her former pupil. *Id.* at 387–88, 279 *A.*2d at 893.

Thus, the implication of the dicta in *Murtha* is clear. Specifically, the clergyperson is the holder of the priest-penitent privilege and can unilaterally waive the privilege by consenting to disclosure or by partial disclosure. Because the former pupil in *Murtha* had not consented to the disclosure, the Appellate Division's suggestion that the nun may have waived the privilege would be senseless, unless the clergyperson or an equivalent had the power unilaterally to waive the privilege.

The Legislature amended the privilege in 1981. *L.*1981, *c.* 303, § 2. The amendment expanded the privilege by adding at the end the following language: "nor shall he be compelled to disclose the confidential relations and communications between and among him and individuals, couples, families or groups with respect to the exercise of his professional counseling role." The amendment did not address the question of who holds the privilege; it merely expanded the type of communications covered by the privilege. In light of the *Murtha* dicta to the effect that the clergyperson alone holds the privilege, one can reasonably infer that the Legislature believes that solely the clergyperson holds the privilege. Had the Legislature believed otherwise, it would have overruled that interpretation when it amended the statute. *See Lemke v. Bailey,* 41 *N.J.* 295, 301, 196 *A.*2d 523, 526 (1963) ("The construction of a statute by the courts, supported ... by continued use of the same language or failure to amend the statute, is evidence that such construction is in accordance with legislative intent. . . . The persuasive effect of such legislative inaction is increased where the statute has been amended after a judicial construction without any change in the language so interpreted."); *see also Quaremba v. Allan,* 67 *N.J.* 1, 14, 334 *A.*2d 321, 328 (1975) (holding same); *In re Petition of Keogh–Dwyer,* 45 *N.J.* 117, 120, 211 *A.*2d 778, 779 (1965) (same); *Egan v. Erie R. Co.,* 29 *N.J.* 243, 250, 148 *A.*2d 830,

834 (1959) (same); *Hooton v. Neeld,* 12 *N.J.* 396, 403, 97 *A.*2d 153, 156 (1953) (same); *Cook v. Bennett Gravel Co.,* 90 *N.J.L.* 9, 12, 100 *A.* 331, 332 (Sup.Ct.1917) (same).

## V

Defendant contends, however, that the Appellate Division's holding that only the clergyperson holds the privilege renders the phrase "shall not be allowed" meaningless, and that well-established principles of statutory construction mandate that a construction rendering a part of a statute meaningless is to be avoided. Although we agree in general that a construction that renders a part of a statute meaningless or superfluous is undesirable, *see Reynolds, supra,* 124 *N.J.* at 564, 592 *A.*2d at 196; *Medical Soc'y, supra,* 120 *N.J.* at 26, 575 *A.*2d at 1352–53, we are not bound to construe statutes so that every word is imbued with significance when nothing indicates that the Legislature so intended. *County of Monmouth v. Wissell,* 68 *N.J.* 35, 43, 342 *A.*2d 199, 204 (1975); *110–112 Van Wagenen Ave. Co. v. Julian,* 101 *N.J.Super.* 230, 235, 244 *A.*2d 123, 126 (App.Div.), *certif. denied,* 52 *N.J.* 490, 246 *A.*2d 450 (1968).

Although the "shall not be allowed" language can possibly refer to the penitent, that language is more probably a vestige of what, perhaps, originally was a rule of competency. The "shall not be allowed" language seems most analogous to the "may not testify" language employed in states where apparently no one may waive the privilege and the rule is more a rule of competence than of privilege. See, *e.g., Ind.Code Ann.* § 34–1–14–5 (Burns Supp. 1986); *Mich.Comp.Laws Ann.* § 600.2156 (West Supp.1986); *see also* Mitchell, *supra,* 71 *Minn.L.Rev.* at 755–56 n. 181 (discussing those statutes).

Given the fact that the privilege in New Jersey is expressly subject to waiver, to ignore the express waiver in favor of the ambiguous phrase "shall not be allowed" would defeat the Legislature's intent. "Where a choice must be made between two imperfect interpretations, the view should be selected which more

likely accords with the probable legislative intent." *Wissell, supra,* 68 *N.J.* at 43, 342 *A.*2d at 204; *see also Roman v. Sharper,* 53 *N.J.* 338, 342, 250 *A.*2d 745, 747 (1969) (holding same).

The language to the effect that the clergyperson "shall not be compelled" to disclose suggests that the clergyperson has the discretion to waive or insist on the privilege. *See* Mitchell, *supra,* 71 *Minn.L.Rev.* at 755–56 n. 181. Moreover, where the intent of a legislature was to make both the clergyperson and the penitent the holders of the privilege, the statute is generally written to state that the clergyperson shall not be compelled to disclose *without the confider's consent. Ibid. Evidence Rule* 29 is not written in that manner.

The principle underlying both the seal of confession and the statutory privilege was not concern for the penitent but rather concern that the clergyperson would be compelled in violation of his or her religious vows to disclose such confidences. Because the principal rationale was to recognize and protect the religious vows of the clergy, to include the penitent as the holder of the privilege was not necessary. Although we recognize "the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return," *Trammel, supra,* 445 *U.S.* at 51, 100 *S.Ct.* at 913, 63 *L.Ed.*2d at 195, we are not persuaded that the comfort of the penitent was the compelling motive for *Evidence Rule* 29.

The numerous state clergy-privilege statutes are not identical and they provide varying treatment of the privilege. Yellin, *supra, Santa Clara L.Rev.* at 114, 137. As such, states are split on the issue of who holds the power to waive the clergyperson-penitent privilege. Mitchell, *supra,* 71 *Minn.L.Rev.* at 756, 778. Most states do not confer the power of waiver on the clergyperson alone. States also differ on which persons qualify under the definition of "clergy" as well as on which situations qualify as confidential communications. O'Brien and Flannery, *supra, Loy. L.A.L.Rev.* at 33. Those various options are all interrelated and

may affect who should hold the privilege and who should have the power to waive the privilege.

We, however, are construing not those statutes but only *Evidence Rule* 29. In view of the legislative history of the priest-penitent privilege in New Jersey and its interpretation by the Jacobs Committee and the Bigelow Commission, we hold that the clergyperson is the sole holder of the privilege. The decision whether to reveal confidential communications rests with the clergyperson alone.

We therefore affirm the judgment of the Appellate Division.

CLIFFORD, J., concurring.

I join in the majority opinion.

The notion that Justice Jacobs and Judge Bigelow, chairmen of the Committee and Commission respectively that bore their names, did not fully understand the ramifications of the Jacobs Committee Report's comment that the "penitent * * * has no privilege at all" is a most remarkable one. Neither of those giants of the legal profession ever left any doubt about where he stood on an issue nor did either suffer from an unwillingness or inability to express his position with unmistakable precision; and for them "the penitent * * * has no privilege at all" meant, as it means to me, that the penitent has no privilege at all. Period.

The dissenters' red herring of the Legislature "depriv[ing] its constituents of the right to confide in their spiritual advisors," *post* at 442, 640 *A*.2d at 835; or of penitents suffering "utter[ ] shock[ ]" at finding that "they have no right to privacy in the confessional," *post* at 442, 640 *A*.2d at 835; or of Legislators declaring that "the sanctity of religious confessions must give way to the needs of the lawsuit," *post* at 443, 640 *A*.2d at 835; or of a priest nattering on at a social gathering about the juicy tidbits in a penitent's confession, *post* at 441, 640 *A*.2d at 835, is just that: a fish of reddish hue that diverts one's focus from the issue before us. Imposing in the priest alone the privilege and the right of waiver does not dilute

the "right to confide" or cause suffering or destroy sanctity or encourage lurid story-telling. Priests keep the confidences of the confessional not because any secular law gives them a privilege to do so but because their churchly obligation, their religious duty, their priestly function requires it of them. They will of course continue to adhere to that higher law, and no ruling of this Court will have the slightest effect on that solemn obligation. The dereliction of a sorely-misguided priest who chooses to ignore that obligation becomes a matter for the priest's church, not for the courts. If a problem exists, it is not with the law, it is with the priest.

I agree with the trial court on the issue that is not before us: the person to whom defendant in this case confessed was not a "clergyman, minister or other person or practitioner authorized to perform similar functions" under *Evidence Rule* 29. Therefore, no matter what one's view of the privilege, the *Evidence Rule* has no application to the facts of this case. Moreover, and more to the point, I find it as unthinkable as do the dissenters that a priest to whom a penitent has disclosed, in the sacrament of confession, his or her pride, covetousness, lust, anger, gluttony, envy, sloth, lawlessness, immorality, perversion, or lesser misdeeds would for one moment entertain the thought of disclosure to *any* third person under *any* circumstances. However, for the occasional priest who might believe that the law—in the form of a subpoena—might trump the dictates of holy orders and require the giving of testimony, the privilege can serve a purpose, or so the Legislature could have concluded.

Finally, if the Court has misperceived the legislative will, small matter in this case (if, as I suspect, the trial court's ruling that no "priest" is involved is correct). The Legislature can clean up the statute, and we can launder the *Evidence Rule* accordingly.

O'HERN, J., dissenting.

I do not believe that our Legislature intends, or that our Rules of Evidence contemplate, that a spiritual adviser should be free to

disclose a confidential spiritual conversation. I reach that conclusion because (1) an overwhelming majority of other jurisdictions construe the privilege as a bar to the revelation of a confession by the cleric, (2) New Jersey law has never recognized a cleric's right to waive the seal of confession, and (3) our state committees on evidence would never have recommended so fundamental a change in doctrine without explicit discussion of the issue.

## I

I begin by analyzing the purposes of the privilege. "[T]he public * * * has a right to every [person's] evidence. * * * [A]ll privileges of exemption * * * are exceptional * * *." 8 *Wigmore on Evidence* § 2192 (McNaughton rev. 1961). Wigmore calls the rules of privilege "requirements of extrinsic policy * * * because some consideration extrinsic to the investigation of truth is regarded as more important and overpowering." *Id.* at § 2175. We do not give attorneys a privilege to refuse to disclose the communications of their clients to save attorneys the time and trouble of appearing in court. We afford that privilege to serve the larger purpose of making clients feel free to obtain assistance in the most troubled times of their lives. Clients must be free to consult with an attorney and must be certain that unless they intend a continuing course of criminal conduct, their confidential communications will be protected. *State v. Toscano*, 13 *N.J.* 418, 424, 100 *A.*2d 170 (1953) (holding that attorney-client privilege "is now universally recognized as resting upon the policy in favor of affording to the client freedom from apprehension in consulting his legal adviser"). Society deems that relationship so important that a lawyer may not reveal even the client's disclosure of a prior crime.

The most commonly-offered rationale for the clergy privilege is society's desire to foster the cleric-confider relationship. Several evidentiary privileges, including the physician-patient privilege,

*N.J.S.A.* 2A:84A–22.1 to –22.7,[1] the attorney-client privilege, *Evidence Rule* 26, and the marital-communication privilege, *Evidence Rule* 28, are designed to foster special relationships between persons by shielding communications within those relationships. "The law has determined that, in the long run, society gains more by fostering such relationships than it gains from disclosure of communications within those relationships." Mary H. Mitchell, *Must Clergy Tell?: Child Abuse Reporting Requirements Versus the Clergy Privilege and Free Exercise of Religion,* 71 *Minn. L.Rev.* 723, 762 (1987).

Most clergy-privilege statutes accomplish that goal of protecting the cleric-penitent relationship by granting the power of waiver to the penitent alone:

> Statutes creating the privilege vary, but generally are designed to safeguard the clergyman's status as a secure repository for the confessant's confidences. Most penitent-priest statutes have a common feature: they explicitly prohibit the clergyman from disclosing the contents of a confidential communication "without the consent of the person making the communication."
>
> [*Seidman v. Fishburne–Hudgins Educ. Found., Inc.,* 724 *F.*2d 413, 415 (4th Cir.1984) (citation omitted) (quoting *Or.Evid.Code,* Rule 506 (1981)).]

For example, in reviewing New York's clergy-privilege statute, which allows waiver only by the penitent, the New York Court of Appeals observed that the Legislature intended to recognize "the urgent need of people to confide in, without fear of reprisal, those entrusted with the pressing task of offering spiritual guidance so that harmony with one's self and others can be realized." *Keenan v. Gigante,* 47 *N.Y.*2d 160, 417 *N.Y.S.*2d 226, 229, 390 *N.E.*2d 1151, 1154 (1979).

The language of our statute is well adapted to that "urgent need of people," stating in plain terms that no member of the clergy shall be either "allowed or compelled" to disclose a confidential

---

1 Consistent with the majority, *ante* at 410 n. 1, 640 *A.*2d at 819, I will use the old numbering for the *New Jersey Rules of Evidence* in this dissent. For those privileges, such as the physician-patient privilege, which we did not adopt as Evidence Rules until we changed the numbering of the Rules, this dissent cites to the statutes.

communication received in a professional role. *Evid.R.* 29. That means at the least that a cleric cannot disclose a confession without the consent of the penitent. That construction prevails throughout the United States. A review of other statutes indicates that only three states (Illinois, Maryland, and Virginia) allow a cleric to disclose a confession without the penitent's consent. All three statutes speak only in terms of the clergy not being compelled to disclose confidential spiritual communications. None prohibits a cleric from breaching such confidences voluntarily. See *Ill.Ann.Stat.* ch. 735, para. 5/8-803 (Smith-Hurd 1993); *Md. Code Ann., Cts. & Jud.Proc.* § 9-111 (1993); *Va.Code Ann.* § 8.01-400 (Michie 1993). Caselaw supports such an interpretation of the privilege in Illinois and Virginia. See *People v. Bole,* 223 *Ill.App.*3d 247, 165 *Ill.Dec.* 739, 585 *N.E.*2d 135 (1991) (allowing minister to testify, over defendant's objection, about defendant's statements to minister concerning number of times defendant had sexual intercourse with stepdaughter), *aff'd,* 155 *Ill.*2d 188, 184 *Ill.Dec.* 423, 613 *N.E.*2d 740 (1993); *Seidman, supra,* 724 *F.*2d 413 (holding that plain meaning of Virginia statute grants privilege to cleric alone, not to penitent). Six other statutes that do not seem to grant a privilege to the penitent actually have that effect because in those states the cleric is deemed to be an incompetent witness, that is, a witness who is not permitted to testify at all about such communications. See *Ga.Code Ann.* § 24-9-22 (Michie 1993); *Ind.Code Ann.* § 34-1-14-5 (West 1993); *Mich.Comp.Laws Ann.* § 600.2156 (West 1993); *Mo.Ann.Stat.* § 491.060 (Vernon 1993); *Vt.Stat.Ann.* tit. 12, § 1607 (1993); *Wyo. Stat.* § 1-12-101 (1993). I believe that the construction of the privilege that requires the penitent's consent to disclosure is prevalent because such a construction fosters the public policies behind the privilege.

## II

### A.

The majority, I believe, mistakenly focuses on the annotation to the Jacobs Committee's Comment on proposed *Evidence Rule* 29

of the *Uniform Rules of Evidence* (1953), which stated that "[u]nder the [Uniform R]ule the penitent has a privilege to refuse to disclose his confession whereas under the [then-extant New Jersey] statute he has no privilege at all." *Report of the Committee on the Revision of the Law of Evidence to the Supreme Court of New Jersey* 77 (1955) *("Jacobs Committee Report ")*. The statute did not confer a privilege on the penitent because any privilege would have been redundant in light of the then-absolute prohibition of clerical disclosure of confessions. Under the 1955 formulation of the statute, a cleric could be neither "allowed [n]or compelled to disclose in any court, or to any public officer, a confession made to him in his professional character * * *." *L.*1947, *c.* 324. The question of privilege did not arise until 1956 when the Commission to Study the Improvement of the Law of Evidence ("Bigelow Commission") recommended to the Legislature the addition of a waiver provision to the statute.[2] Hence, the deference due to the comments of one so astute as Justice Jacobs must be tempered by the realization that his committee was referring to a statute that gave ironclad protection to the penitent, an ironclad protection that the majority views as corroded by the waiver amendment recommended by the Bigelow Commission.

Moreover, any concern of the Jacobs Committee that proposed *Evidence Rule* 29 might have permitted the penitent to force a cleric to violate his or her sacred oath by disclosing a confidential spiritual communication was unfounded. The Drafters' Comment to *Uniform Rule* 29, which both the majority opinion and the *Jacobs Committee Report* quote, clearly states that "[t]his rule permits either priest, broadly defined, or penitent to claim the privilege." *See ante* at 426, 640 *A.*2d 827; *Jacobs Committee*

---

[2] The Legislature appointed the Bigelow Commission to review the Jacobs Committee's draft in fulfillment of the Legislature's concurrent responsibility for the Rules of Evidence. J.Res. 15, 179th Leg., 1955 New Jersey Laws 1026. The Bigelow Commission adopted the Jacobs Committee draft to a large extent. However, it broadened the cleric-penitent privilege to cover more than just confessions and subjected the privilege to the waiver provisions of *Evidence Rule* 37.

*Report, supra,* at 76. The Jacobs Committee rejected *Uniform Rule* 29 because it wanted to ensure that the clergy could not be unilaterally compelled by a penitent's waiver to disclose a confidential communication. However, the clergy is protected from such a risk if both the cleric and the penitent hold the privilege because then the penitent cannot compel the cleric to disclose the confidential communication. (Of course, the penitent can always testify about the confession in his or her own defense, despite the objections of the cleric.) A further consideration about the Jacobs Committee's conclusions is that the notion that penitents could compel clerics to disclose their confessions, although disturbing, is not nearly as threatening as the notion that a cleric could *voluntarily* disclose such communications against the penitent's wishes.

Concededly, the statute did not explicitly grant a privilege to the penitent; however, such a privilege was simply unnecessary in light of the statute's formulation. Furthermore, no New Jersey case has ever held that the penitent does not have such a privilege. The majority's discussion of *In re Murtha,* 115 *N.J.Super.* 380, 279 *A.*2d 889, *certif. denied,* 59 *N.J.* 239, 281 *A.*2d 278 (1971), is inapplicable. In that case, the court admitted the evidence not because the penitent had no privilege but because the court believed that the Catholic nun involved in the case did not meet the former definition of a priest or cleric. If the nun in *Murtha* had fulfilled the definition's requirements, our Court would have held that either the statutory privilege or a common-law privilege barred the testimony at issue.

### B.

The Bigelow Commission's addition of the reference to the waiver provisions of *Evidence Rule* 37 raises many questions. Until the Appellate Division opinion in this case, the Commentary to the *New Jersey Rules of Evidence* had simply assumed that [t]he inclusion of this [waiver] provision by the Bigelow Commission was probably in error because it contradicts the thrust of the rule and the original statute, namely that *under no circumstances should a religious figure be considered as a source of evidence of this type.* Since the person who made the confidential

communication is not the holder of this privilege, no conduct on his part falling within the scope of Rule 37 can effectively compel disclosure by the religious figure.

[Biunno, *Current N.J. Rules of Evidence,* comment 2 on *Evid.R.* 29 (1988) (emphasis added).]

The majority views the Bigelow Commission's inclusion of that waiver provision and the Jacobs Committee's comment that the penitent has no privilege as an acknowledgment of a unilateral confessional privilege that the cleric may waive without consent of the penitent. The language of the waiver reference is most inept for the interpretation that the Court reaches. *Evidence Rule* 29 provides the following:

*Subject to Rule 37* [the waiver provision], a clergyman, minister or other person or practitioner authorized to perform similar functions, of any religion shall not be allowed or compelled to disclose a confession or other confidential communication made to him in his professional character, or as a spiritual advisor in the course of the discipline or practice of the religious body to which he belongs or of the religion which he professes, nor shall he be compelled to disclose the confidential relations and communications between and among him and individuals, couples, families or groups with respect to the exercise of his professional counselling role.

[Emphasis added.]

*Evidence Rule* 37 provides the following:

A person waives his right or privilege to refuse to disclose or prevent another from disclosing a specified matter if he or any other person while the holder thereof has (a) contracted with anyone not to claim the right or privilege or, (b) without coercion and with knowledge of his right or privilege, made disclosure of any part of the privileged matter or consented to such a disclosure made by anyone.

A disclosure which is itself privileged or otherwise protected by the common law, statutes or rules of court of this State, or by lawful contract, shall not constitute a waiver under this section. The failure of a witness to claim a right or privilege with respect to one question shall not operate as a waiver with respect to any other question.

To begin with, the "clergy privilege" does not speak of the cleric having a privilege, even though the Rule's heading, which is normally not to be used for interpretive purposes, refers to a "privilege." When the language of a statute does not fit the meaning ascribed to the statute, we can safely assume that the Legislature did not intend the ascribed meaning. The generic waiver provisions of *Evidence Rule* 37 simply do not fit the

context of *Evidence Rule* 29. That a cleric would "contract[ ] with [someone] not to claim the right or privilege" is an ·incredible proposition. That a cleric would "without coercion and with knowledge of his right or privilege" disclose a confession is an equally implausible scenario. A cleric who would "consent[ ] to such a disclosure made by anyone" else is also a highly improbable character. To create a situation in which *Evidence Rule* 37 would apply to *Evidence Rule* 29, we must conjure up, for example, a priest who would blurt out at a social gathering that penitent Jones mentioned during confession that he has visited a crack house, or a priest who would give consent to Smith, who happened to be standing near the confessional, to disclose Jones's confession. The utter incongruity of (1) interpreting the Rule to give the priest the right to waive the privilege not to testify when the Rule clearly declares that clerics are not "allowed" to testify and (2) basing that right of waiver on the concept of the priest entering. into a contract of disclosure with a tabloid publisher or blurting out a confession in a crowded. elevator is unthinkable.

The Bigelow Commission may have included the waiver provision of *Evidence Rule* 37 because the proposed *Evidence Rule* 29 could have applied to a penitent who, having already disclosed the communication, sought thereafter to claim the privilege. When the Bigelow Commission inserted the subject-to-waiver provision in *Evidence Rule* 29, it did not need to explain that the cleric could never disclose the confession without the consent of the penitent because the public would have assumed that a cleric would never break the seal of confidence. That inviolability of the confessional was so imbedded in our legal culture that no one considered the possibility that a penitent would have to request the privilege's invocation.

### III

To conclude that the penitent has no privilege, one must infer that the Legislature intended that the most privileged of all communications be converted into the least. The majority's conclusion that the privilege belongs only to the cleric creates an

exception so startling that it could not possibly be what the Legislature intended. The lawyer-client privilege, *Evidence Rule* 26, the physician-patient privilege, *N.J.S.A.* 2A:84A–22.1 to –22.7, the psychologist-patient privilege, *N.J.S.A.* 45:14B–28, the marriage-counselor privilege, *N.J.S.A.* 45:8B–29, and the victim-counselor privilege, *N.J.S.A.* 2A:84A–22.13 to –22.16, all belong, at least in part, to the confider. I cannot believe that our Legislature, which has codified all those privileges by concurrent resolution, would have intended that of all the privileges it has recognized, the confider would hold the privilege except in the case of a communication to clergy. Could the Legislature have deemed spiritual counseling a second-hand ministry, of less importance to society than lawyering or marriage counseling or victim counseling? I do not believe that the Legislature intended such an anomaly. The statutory privilege is unambiguous. It states that a member of the clergy shall not be "allowed or compelled" to disclose a confidential communication. *Evid.R.* 29.

The overwhelming argument against the majority's conclusion is the virtual certainty that the New Jersey Legislature would not, without serious debate, deprive its constituents of the right to confide in their spiritual advisors. The American Civil Liberties Union (ACLU), as *amicus curiae*, has argued that denying the privilege of nondisclosure to the penitent imposes an unconstitutional burden on the penitent's right to the free exercise of religion because that denial is not narrowly tailored to advance a compelling state interest. The State's interest in obtaining all relevant testimony may be compelling in some cases, such as instances of continuing child abuse. However, as interpreted by the majority, *Evidence Rule* 29 denies penitents the right to bar disclosure of their spiritual confessions under *any* circumstances.

Although most penitents still trust their priests, ministers, or counsellors, they would be utterly shocked to find that they have no right to privacy in the confessional. Can one conceive of the reaction that would have followed in this state if someone in the Legislature in 1957 had stood up and said, "I want the clergy to be able to disclose confessions at will, no matter what the person

giving the confession wants, because the sanctity of religious confessions must give way to the needs of a lawsuit." I doubt that any legislator would have taken such an extreme position.[3] Given common notions of what is right, what is permissible, and what is, to some, sacred, most people, not just members of one sect or another, would have regarded such a proposal as unthinkable, or at least as an affront to religion and religious people. I do not say that to inflame emotions, but rather to indicate a very strong conviction about the legislative intent behind the cleric-penitent privilege. We should not interpret the language of an act to reach a result that we are convinced the Legislature did not intend. We accord broad latitude to the Legislature's judgment on how it may best serve its purposes. We will not even permit "the intent of. the Legislature to be subverted by language which, read literally, appears to contravene that which the Legislature actually intended." *In re Boardwalk Regency Casino License Application,* 180 *N.J.Super.* 324, 344, 434 *A.*2d 1111 (App.Div.1981), *aff'd,* 90 *N.J.* 361, 447 *A.*2d 1335 (1982); *see also State v. State Troopers Fraternal Ass'n,* 134 *N.J.* 393, 401, 634 *A.*2d 478 (1993) (holding that even though literal reading of statute could result in application of law to State Police, legislative purpose did not suggest that result). Here, the language of *Evidence Rule* 29 (the cleric shall not be "allowed or compelled" to disclose the confidence) and of *Evidence Rule* 37 (a person can waive a privilege through "contract," disclosure "without coercion and with knowledge," or "consent" to disclosure by another) support the unquestionable conclusion that the Legislature could not possibly have intended that clerics be free to disclose religious confidences. Circumstances in which the Legislature may want to alter the privilege, as in the case of continuing child abuse, may arise; however, that type of legislative change has not yet occurred and is not addressed here. *See, e.g., L.*1992, *c.* 142 (modifying spousal privileges).

---

[3] The position *is* extreme, for this case is not just about waiver in criminal cases or even murder cases. The Court's holding means that a cleric may waive the seal of. confidence in *any* case, for example in a tax matter.

## IV

This is a shocking case. Craig Szemple is implicated in the commission of crimes of brutal violence. Had he been visited in prison by a psychologist and sought mental counseling, he would have had the privilege to bar the psychologist's disclosure of their discussions of the crime. Had he been visited in prison by an attorney and sought counseling on how he should prepare his defense, he would have had the privilege to bar the attorney's disclosure of their discussions of the crime. Instead of seeking psychological counseling or legal counseling, Szemple sought spiritual counseling. If the purpose of the cleric-penitent privilege is to foster the relationship between a confider and a spiritual counselor, that purpose is not served when the cleric becomes a witness for the prosecution.

I suspect that the issue in this case will rarely, if ever, arise again. In the almost fifty years since the adoption of the privilege, no member of the clergy has, in any reported case, ever betrayed a penitent's spiritual trust. Szemple's case should not turn on the fortuity of his encounter with a cleric whose religious views encompassed disclosure of spiritual confidences. The clergy privilege exists not for the cleric to choose among the worthy members of the flock but to furnish a "secure repository for the confessant's confidences." *Seidman, supra,* 724 *F*.2d at 415. Because the evidentiary privilege belongs to both the cleric and the penitent, we cannot sustain a conviction based on the disclosure of a confidential spiritual communication.

Chief Justice WILENTZ and Justice STEIN join in this opinion.

*For affirmance*—Justices CLIFFORD, HANDLER, POLLOCK and GARIBALDI—4.

*For reversal*—Chief Justice WILENTZ and O'HERN and STEIN—3.